921 F.2d 241
 FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION, as Receiver
for Centennial Savings and Loan Association, a
corporation, Plaintiff-Appellee,
v.
GEMINI MANAGEMENT; Robert W. O'Neel, aka R.W. O'Neel;
Ellen W. O'Neel, aka Ellen O'Neel, aka Mrs. Robert
W. O'Neel, Defendants-Appellants.
 No. 89-15662.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 5, 1990.
Decided Dec. 21, 1990.
 
 Andrew A. August, Bayer & August, San Francisco, Cal., for defendants-appellants.
 Joseph N. Demko and Robert B. Kaplan, Frandzel & Share, San Francisco, Cal., for plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of California.
 Before BROWNING, PREGERSON and TROTT, Circuit Judges.
 TROTT, Circuit Judge:
 
 
 1
 The Federal Savings and Loan Insurance Corporation (the "FSLIC") was appointed receiver for Centennial Savings and Loan Association ("Centennial"), and filed suit against Gemini Management Corporation ("Gemini"), Robert W. O'Neel, and Ellen W. O'Neel[1] on a promissory note and a personal guaranty agreement. Gemini asserted counterclaims and affirmative defenses based on a prior loan commitment letter. The district court dismissed the counterclaims and struck the affirmative defenses, finding the loan commitment letter was a "secret agreement" prohibited by D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). Gemini now appeals. We have jurisdiction under 28 U.S.C. Sec. 1291, and we affirm.
 
 
 2
 * In 1984, Robert O'Neel and a partner formed Gemini and developed a business plan to open and operate a private social club and restaurant in San Francisco. They approached Centennial in an attempt to secure financing for the venture. On August 6, 1984, Centennial sent Gemini a written loan commitment letter (the "First Letter" or the "Letter") pursuant to which Centennial agreed to finance Gemini's proposed project with a loan of $1,545,000.00. The First Letter included an integration clause, providing:
 
 
 3
 This commitment constitutes the entire agreement between the parties concerning the subject matter hereof and supersedes any prior agreements or negotiations, whether written or oral.
 
 
 4
 The First Letter also required that Gemini complete various loan applications, and return a signed copy of the Letter to evidence Gemini's acceptance of its terms, all to be received by Centennial no later than August 20, 1984.[2] All agree that Gemini executed and delivered the completed loan applications within the appropriate time period. With regard to the signature provision, however, the FSLIC claims "the commitment letter was never signed by Gemini so as to indicate its acceptance of the terms and conditions of the commitment letter." Although Gemini alleged in its counterclaim that the Letter was signed, no signed copy was ever presented to the district court.[3]
 
 
 5
 Finally, the First Letter required that the loan be evidenced by proper documentation:
 
 
 6
 The loan will be evidenced by a Promissory Note; UCC1 filing statement; Security Agreement, plus such other documentation as [Centennial] deems reasonably necessary. All documentation shall be on [Centennial's] required forms.
 
 
 7
 No documents were ever executed pursuant to the First Letter.
 
 
 8
 Following numerous discussions between the parties, O'Neel and his partner met with Centennial's officers on September 25, 1984. At this meeting, Centennial's officers presented O'Neel with a new loan commitment letter (the "Second Letter") providing that Centennial agreed to finance Gemini's project with a loan having an "initial principal balance of $1,100,000.00." Unlike the First Letter, the Second Letter contained no integration clause. O'Neel immediately protested the change in principal amount, but he was assured the $445,000 shortfall would be forthcoming. Accordingly, O'Neel believed there was still an agreement to finance the entire project with a loan of $1,545,000, so he agreed to the terms of the Second Letter. He relied not only on Centennial's oral assurances at the September 25 meeting, but also on "the continuing vitality of the First [Letter] (because of the absence of an integration clause in the Second [Letter]."
 
 
 9
 The September 25 meeting produced the following documents:
 
 
 10
 (1) The Second Letter;
 
 
 11
 (2) A "Building Loan Agreement" for a loan to Gemini of $1,100,000;
 
 
 12
 (3) A promissory note evidencing the $1,100,000 loan (the "Note"); and
 
 
 13
 (4) A personal guaranty of $500,000 executed by Robert O'Neel (the "Guaranty").
 
 
 14
 After the initial loan documents were signed and Gemini received its first principal installment, it commenced renovation of property located at 1409 Sutter Street in San Francisco, which it previously had leased from Evans-Pacific Corporation ("Evans-Pacific"). Because Centennial failed to provide the additional $445,000, however, the renovations were not completed on schedule, and Gemini was unable to begin its membership sales campaign. As a result, Gemini was also unable to make its rental and lease payments to Evans-Pacific or comply with the terms of the Note. Centennial accelerated Gemini's loan balance and made written demands (1) on Gemini to comply with the terms of the Note, and (2) on O'Neel to comply with the terms of the Guaranty.
 
 
 15
 In April 1987, the Federal Home Loan Bank Board appointed the FSLIC as receiver for Centennial. On April 28, 1988, the FSLIC filed a complaint against Gemini and the O'Neels, alleging breach of the Note and the Guaranty. Gemini answered the complaint and filed a compulsory counterclaim asserting Centennial and the FSLIC had "breached a written loan commitment agreement to lend Gemini the $1,545,000 needed to successfully complete the project."
 
 
 16
 On November 18, 1989, the district court granted the FSLIC's motions (1) to dismiss Gemini's counterclaims pursuant to Fed.R.Civ.P. 12(b)(6), and (2) to strike Gemini's affirmative defenses pursuant to Fed.R.Civ.P. 12(f). On February 10, 1987, the FSLIC filed a motion for summary judgment under Fed.R.Civ.P. 56, which was granted on April 17, 1989.
 
 II
 
 17
 We must decide whether the district court erred in granting the FSLIC's motion to dismiss Gemini's counterclaim under Fed.R.Civ.P. 12(b)(6), or abused its discretion in striking Gemini's affirmative defenses under Fed.R.Civ.P. 12(f).
 
 
 18
 "We review de novo a dismissal for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6)." Cook, Perkiss & Liehe, Inc. v. Northern California Collection Serv., 911 F.2d 242, 244 (9th Cir.1990); Wileman Bros. & Elliott, Inc. v. Giannini, 909 F.2d 332, 334 (9th Cir.1990). "We must accept material allegations in the complaint as true and construe them in the light most favorable to the appellant...." Cook, 911 F.2d at 244. "We may affirm the district court's dismissal 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " Id. (quoting Ascon Properties v. Mobil Oil Co., 866 F.2d 1149, 1152 (9th Cir.1989)).
 
 
 19
 We review the district court's grant of a motion to strike affirmative defenses for an abuse of discretion. Supermarket of Homes v. San Fernando Valley Bd. of Realtors, 786 F.2d 1400, 1409 (9th Cir.1986).
 
 III
 
 20
 In 1942, the Supreme Court articulated a rule designed to implement a "federal policy to protect [the FDIC] and the public funds which it administers against misrepresentations as to the securities or other assets in the portfolios of the banks which [the FDIC] insures or to which it makes loans." D'Oench Duhme & Co. v. FDIC, 315 U.S. 447, 457, 62 S.Ct. 676, 679, 86 L.Ed. 956 (1942). This policy is as sound today as it was in 1942, if not more so.
 
 
 21
 In D'Oench, a brokerage firm executed a note in favor of a bank for no consideration, and with the understanding that the note would never be called for payment. The firm had previously sold the bank a quantity of bonds, which later defaulted. To cover the loss, the bank requested that the firm execute a demand note, payable to the bank, for the amount due on the bonds. The bank then carried the note, instead of the past due bonds, as an asset on its books. The firm and the bank agreed orally that the proceeds of the bonds would be credited to the note, and the note would never be called for payment.
 
 
 22
 The bank later failed, and the FDIC acquired the note as part of the collateral securing a loan to the bank. When the FDIC brought suit on the note, the defendant claimed the oral agreement with the bank relieved him from liability. The Supreme Court held the defendant "was responsible for the creation of the false status of the note in the hands of the bank. It therefore cannot be heard to assert that the federal policy to protect [the FDIC] against such fraudulent practices should not bar its defense to the note." D'Oench, 315 U.S. at 461, 62 S.Ct. at 681.
 
 The Court noted further:
 
 23
 Plainly one who gives such a note to a bank with a secret agreement that it will not be enforced must be presumed to know that it will conceal the truth from the vigilant eyes of the bank examiners.
 
 
 24
 ... The test is whether the note was designed to deceive the creditors or the public authority, or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which [the FDIC] relied in insuring the bank was or was likely to be misled.
 
 
 25
 Id. at 460, 62 S.Ct. at 680-81 (emphasis added).
 
 
 26
 If the D'Oench doctrine applies in the present case, it would, without a doubt, operate to bar Gemini's defenses and counterclaims. If the "agreement" to fund the entire Sutter Street project was not reflected in Centennial's records, it is clear that the FSLIC would have been misled about Centennial's financial condition. See FDIC v. Two Rivers Assoc., 880 F.2d 1267, 1274 (11th Cir.1989).
 
 
 27
 In addition, O'Neel "lent himself to" the arrangement that misled the FSLIC.
 
 
 28
 Certainly, one who signs a facially unqualified note subject to an unwritten and unrecorded condition upon its repayment has lent himself to a scheme or arrangement that is likely to mislead the banking authorities, whether the condition consists of performance of a counterpromise (as in D'Oench Duhme ) or of the truthfulness of a warranted fact.
 
 
 29
 Langley v. FDIC, 484 U.S. 86, 93, 108 S.Ct. 396, 402, 98 L.Ed.2d 340 (1988). Here, O'Neel had every opportunity to insist that the agreement for the extra $445,000 be stated explicitly in any of the many loan documents executed on September 25, and his failure to do so constitutes negligence. See FDIC v. First Nat'l Fin. Co., 587 F.2d 1009, 1012 (9th Cir.1978) (defendant need not have "knowledge of the specific scheme or fraudulent arrangement to preclude the defense; it is sufficient that he lends himself to a scheme to aid the bank in concealing the true nature of the transaction ..."); FDIC v. Meo, 505 F.2d 790, 793 (9th Cir.1974) (D'Oench inapplicable only if defendant is completely "innocent of any wrongdoing or negligence").
 
 
 30
 Gemini claims the D'Oench doctrine does not apply because the agreement was not a "secret agreement," but rather was evidenced by the First Letter, which "obligated" Centennial, and the FSLIC as its successor in interest, to loan Gemini $1,545,000 to complete the renovation project. Since the First Letter was in Centennial's files and available to FSLIC, Gemini argues, the agreement was not "secret" and the D'Oench doctrine should not apply. We are therefore left to decide whether the First Letter is a sufficient reflection of Centennial's commitment to lend Gemini $1,545,000 under D'Oench and its progeny. We hold it is not.
 
 IV
 
 31
 An important purpose of the D'Oench doctrine is "to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets." Langley, 484 U.S. at 91, 108 S.Ct. at 401.[4] In Langley, the Supreme Court noted that "[n]either the FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions." Langley, 484 U.S. at 91-92, 108 S.Ct. at 401-02. These words are particularly meaningful today. As the Savings and Loan crisis in which this nation is mired continues to unfold, regulators are discovering abuses the D'Oench Court could not have imagined or predicted. The FSLIC's ability to evaluate the financial condition of troubled thrift institutions depends, now more than ever, upon the protective shield of D'Oench.
 
 
 32
 We cannot condone a transaction with the capacity to deceive the banking regulators, nor can we reward Gemini and Centennial for their creative and deceptive paperwork. There is no explicit statement in Gemini's loan file, or anywhere else in Centennial's records, of any obligation beyond the fully documented loan of $1.1 million. The First Letter is the only written record of Centennial's intent to loan the entire $1.5 million, and it is not enough to defeat D'Oench. Centennial's "intent" to loan the additional $445,000 falls short of establishing that Centennial was obligated to fund the entire project. We believe D'Oench and its progeny require a clear and explicit written obligation. See, e.g. Two Rivers, 880 F.2d at 1276.
 
 
 33
 The First Letter was unsigned, was not evidenced by a promissory note, and therefore expired by its own terms on August 20, 1984. The Second Letter, on the other hand, was signed and supported by full loan documentation. It was perfectly reasonable for the FSLIC to conclude that the terms of the First Letter were completely superseded by the Second Letter and its supporting documents. As stated by the Eleventh Circuit in Two Rivers, 880 F.2d at 1276, "the question is whether the FSLIC was put on notice of any agreement that [Centennial] was obligated to fund the entire project." The Two Rivers court, whose reasoning we adopt, held:
 
 
 34
 If ... the records of a bank evidence all the obligations of the bank, the regulating authority will not be deceived. Thus, D'Oench, Duhme does not bar the assertion of defenses based on a bilateral obligation which appears in the bank's records.
 
 
 35
 Id. at 1275 (emphasis added).
 
 
 36
 The Fifth Circuit has also held that an agreement not "clearly evidenced in the bank's records ... would not be apparent to bank examiners." Beighley v. FDIC, 868 F.2d 776, 784 (5th Cir.1989); see also Mainland Sav. Assoc. v. Riverfront Assoc., 872 F.2d 955, 956 (10th Cir.1989) ("Nothing in the note, accompanying security agreements or other documents pertaining to the transaction evidences any type of conditional promise or side agreement ... of which the FSLIC might have been aware"); Howell v. Continental Credit Corp., 655 F.2d 743, 746 (7th Cir.1981) (D'Oench inapplicable only if collateral agreement "facially manifests bilateral obligations").
 
 
 37
 We conclude that the First Letter does not constitute a clear and explicit bilateral obligation for Centennial to loan Gemini the additional $445,000. As a result, Gemini relies on an unrecorded, unwritten, "secret" agreement, and the D'Oench doctrine applies. Accordingly, the decision of the district court is
 
 
 38
 AFFIRMED.
 
 
 
 [1]
 Throughout this opinion, we will refer to Appellants collectively as "Gemini."
 
 
 [2]
 The provision requiring acceptance by signature read as follows:
 Please evidence your acceptance of this commitment by returning a signed copy of this letter to [Centennial] no later than August 20, 1984. If [Centennial] does not receive the fully executed letter by said date, it shall have no further obligation in connection with this letter.
 
 
 [3]
 At oral argument, Gemini presented for the first time a signed copy of the Letter. We cannot consider this "evidence" as it is not part of the record below
 
 
 [4]
 The Langley Court interpreted 12 U.S.C. Sec. 1823(e), holding that section 1823(e) was meant to offer as much protection as the common law rule in D'Oench