In re Francis X. QUEEN, Sr. and Jeffrey A. Schreiber, Esq., as Chapter 7 Trustee in the Matter of FXQ, Inc., Plaintiffs,

v.

FIRST SERVICE BANK FOR SAVINGS, Federal Deposit Insurance Corp., as liquidating agent for the First Service Bank for Savings, Robert F. Fredo, Jr., individually and in his official capacity as former Senior Vice–President of the Bank, and Columbo ("Sonny") Deagazia, individually and in his official capacity as former Senior Vice–President of the Bank, Defendants.

Civ. No. C–89–537–D.

United States Bankruptcy Court, D. New Hampshire.

June 7, 1991.

**6**

Jean Claude Sakellarios, Manchester, N.H., for Francis Queen.

John J. Graubard, New York City, for Federal Deposit Ins. Corp.

Steven A. Solomon, Manchester, N.H., for Federal Deposit Ins. Corp. (Local Counsel).

Jeffrey A. Schreiber, Trustee, Salem, Mass.

U.S. Trustee, Boston, Mass.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

The FDIC brought a motion for summary judgment against the plaintiffs[1] in this lender liability action. The FDIC principally relies on the *D'Oench* doctrine and 12 U.S.C. § 1823(e); it claims the alleged unwritten secret agreements cannot constitute a claim against the FDIC. The Court heard oral arguments on March 22, 1991, and I then took the matter under submission.

### I. ALLEGATIONS

The plaintiffs claim the First Service Bank for Savings entered into various oral agreements concerning real estate development with the plaintiffs, which the bank failed to keep. The allegations relate to three separate parcels of property which are analyzed separately.

#### A. *Railroad Avenue Project*

The plaintiffs sought to construct an 18 unit residential condominium building on Railroad Avenue in Derry, New Hampshire. The plaintiffs claim that the seller of the land, Sunshine Development Corp., agreed to provide a second mortgage of $400,000, with $200,000 paid immediately to Sunshine and $200,000 paid on the sale of the completed project.

Then, the plaintiffs obtained a written $1.1 million loan commitment from the bank; $200,000 would be paid for land acquisition, and $900,000 would fund construction. At the closing, however, the bank presented an agreement wherein Sunshine would be paid $300,000 immediately. Plaintiffs allege that the bank assured them that the bank would extend the $100,-

---

**1.** This motion is being treated as being brought against both plaintiffs although the original mo- tion was only brought against Francis X. Queen.

000 more needed to complete construction when the project was nearer completion.

When the time came for the needed funds, the bank executive with whom the plaintiffs were dealing had left and the successor denied the additional loan. Subsequently, a third executive acknowledged the mistake and promised the plaintiffs more money. In reliance on this promise the plaintiffs expended additional funds. Then, the bank was closed without the plaintiffs ever receiving the funds.

At about the time that the original loan was closed, the bank entered into a written Equity Participation Agreement. This agreement did not promise additional loans, however, nor did it involve a sharing of profits. The agreement only provided that the bank would receive a fixed fee upon the sale of each unit (the amount of the fee depended on the unit price).

### B. Gamanche Road Project

The plaintiffs also worked with the bank for the construction of three residential duplex units on Gamache Road in Derry, New Hampshire. The initial agreement provided that the plaintiffs would borrow $465,000, with $195,000 being used for land acquisition costs. The idea was that one duplex, with a finished value of $240,000, would be completed and sold, and the proceeds would be used to pay down the loan and finish the second unit. Then, after the second unit was sold, which would also have a value of $240,000, money would be available to finish the third unit. The plaintiffs allege that the parties understood the project could not be completed on the initial financing.

When the first unit was nearly finished in the summer of 1988, the plaintiffs asked for more money to finish the first unit since the $15,000 left of the construction loan was not enough to complete the unit. The bank's first executive with whom the plaintiffs dealt agreed. But when the third executive subsequently took over he changed the deal. He said the other two units would not be completed after the first unit was sold, and all remaining proceeds from the sale of the first unit would go to the bank. But he did say the cost to finish the first unit would be forwarded to the plaintiffs on closing the first unit. The plaintiffs then completed the first unit, but the bank did not pay as promised at the closing. The other two units were never completed.

### C. Lowell Road Project

The plaintiffs also worked with the bank for the construction of a multi-unit residential and commercial building complex in Hudson, New Hampshire. Allegedly, the bank promised to finance the project and issued an initial loan of $35,000 for use as a deposit on the property under a purchase agreement. Then, when the first bank executive left, the next executive refused to finance the project, which caused the plaintiffs certain damages.

### D. Legal Theories

Plaintiffs allege a variety of legal theories which include: breach of contract, negligent misrepresentation, intentional misrepresentation, fraud, breach of fiduciary duty, unfair trade practices established by statute, and violation of banking regulations.

## II. LEGAL DISCUSSION

To obtain summary judgment, the FDIC must show there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). In regards to a "genuine issue" the First Circuit recently stated:

A 'genuine' issue exists if the evidentiary submissions, viewed in the light most congenial to the nonmovant, will allow a rational fact finder to find in favor of either party ...

Rule 56 does not invite a court to enter the realm of surmise. Evidence that is based on conjecture or farfetched supposition is not sufficient to derail operation of the rule.... Even in cases involving so ineffable a matter as motive or intent, summary judgment may be warranted 'if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'

*Medina–Munoz [v. R.J. Reynolds Tobacco Co.],* 896 F.2d [5] at 8. [1st Cir.1990]. *Local No. 48, United Brotherhood of Carpenters and Joiners of America v. United Brotherhood of Carpenters and Joiners of America,* 920 F.2d 1047, 1050–51 (1st Cir. 1990). See also *FDIC v. Caporale,* 931 F.2d 1 (1st Cir.1991) (applying summary judgment standard in borrower—FDIC dispute concerning failed bank).

### A. *The D'Oench Doctrine*

■ All of plaintiffs' claims are based on alleged oral agreements. Thus, it appears the case of *D'Oench, Duhme & Co. v. F.D.I.C.,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) is directly implicated. In that case, the court established that secret agreements that are capable of misleading the FDIC in its evaluation of a bank's financial condition are invalid and cannot be used as a defense or claim in an action against the FDIC. The precise words of the Supreme Court were as follows:

Plainly one who gives such a note to a bank with a secret agreement that it will not be enforced must be presumed to know that it will conceal the truth from the vigilant eyes of the bank examiners ... The test is whether the note was designed to deceive the creditors or the public authority, or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled.

*Id.* at 460, 62 S.Ct. at 681.

The First Circuit and other courts agree that plaintiffs suing the FDIC over an alleged oral promise to loan money are barred by the *D'Oench* doctrine. See *Timberland Design, Inc. and William C. Barnsley v. First Serv. Bank for Savings,* 932 F.2d 46 (1st Cir.1991); *Bowen v. FDIC,* 915 F.2d 1013 (5th Cir.1990); *Bell & Murphy and Assoc., Inc. v. Interfirst Bank Gateway, N.A.,* 894 F.2d 750 (5th Cir.1990) cert. denied — U.S. ——, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990); *Tuxedo Beach Club Corp. v. City Federal Savings Bank,* 749 F.Supp. 635 (D.N.J.1990).

Other recent cases uniformly hold that oral agreements of any type are barred by the *D'Oench* doctrine. See, e.g., *FDIC v. McCullough,* 911 F.2d 593 (11th Cir.1990); *FDIC v. Kasal,* 913 F.2d 487 (8th Cir.1990); *Federal Sav. & Loan Ins. Corp. v. Gemini Management,* 921 F.2d 241 (9th Cir.1990); *Hall v. FDIC,* 920 F.2d 334 (6th Cir.1990); *Mainland Sav. Ass'n v. Riverfront Associates, Ltd.,* 872 F.2d 955 (10th Cir.1989); *Stowall v. FDIC,* 260 Ga. 475, 396 S.E.2d 484 (1990).

The plaintiffs in this case still contend that there are two reasons why the *D'Oench* doctrine should not apply in this case. First, they argue that there was no "misconduct" on the part of the plaintiffs. The First Circuit has just addressed the issue of whether misconduct is required, and held squarely that it is not required. In *Timberland Design, Inc., supra,* at 49 the Court stated "the *D'Oench* doctrine applies where the only element of fault on the part of the borrower was his or her failure to reduce the agreement to writing." Also, in *FDIC v. Caporale,* 931 F.2d 1 (1st Cir.1991), the court stated:

... under *D'Oench,* they may not rely on a condition that was not reflected in the bank's official records, even if their reliance was in good faith and there was no intent to defraud. *See Fed. Deposit Ins. Corp. v. P.L.M.,* 834 F.2d [248] at 253 [1st Cir.1987]; *Fed. Deposit Ins. Corp. v. McClanahan,* 795 F.2d 512, 516–17 (5th Cir.1986). As among borrowers, thrift regulators, depositors, and creditors, the borrower is in the best position to protect himself and must therefore suffer the risk of loss if he fails to ensure that his agreement is properly recorded. *See Bowen v. Federal Deposit Ins. Corp.,* 915 F.2d 1013, 1016 (5th Cir.1990).

The Fifth Circuit in *Bowen, supra* at 1016, gave this justification for the lack of a misconduct requirement:

The lack of a malfeasance requirement makes *D'Oench, Duhme* a sharp sword and sturdy shield indeed. What is the purpose of such imposing armaments?

Fundamentally, *D'Oench* attempts to ensure that FDIC examiners can accurately assess the condition of a bank based on its books. The doctrine means that the government has no duty to compile oral histories of the bank's customers and loan officers. Nor must the FDIC retain linguists and cryptologists to tease out the meaning of facially-unencumbered notes. Spreadsheet experts need not be joined by historians, soothsayers, and spiritualists in a Lewis Carroll-like search for a bank's unrecorded liabilities. Perhaps mindful of the fate that befell the Baker, whose search for the Shark ended with his own disappearance, *D'Oench, Duhme* seeks to ensure that a bank's assets do not "softly and suddenly vanish away."

The Eleventh Circuit in *McCullough, supra*, at 600, gave a similar explanation stating as follows:

> ... if side agreements or other inducements cannot be determined by a review of the bank's files, then it cannot be said, without additional proof, that the FSLIC or the FDIC was aware of the additional commitments allegedly made by the bank. Given federal policy favoring reasonable reliance upon existing bank records evidencing all of the bank's existing commitments, *see [Federal Savings & Loan Ins. v.] Two River Associates*, 880 F.2d [1267] at 1275 [11th Cir.1989] such unrecorded commitments will not be honored.

While on its face, such a policy may appear inequitable to those parties relying upon a bank's unrecorded promises or arrangements, it must be recalled that a party who accedes to a bank's oral inducements without memorializing the same is, to at least some extent, responsible. Because such a party "lent himself to a scheme or arrangement whereby the banking authority ... was likely to be misled," that party cannot rely upon that same scheme or arrangement to defend against the banking authority's subsequent actions. *See Langley v. FDIC*, 484 U.S. [86] at 92, 108 S.Ct. [396] at 402 [98 L.Ed.2d 340 (1987)]. The

*D'Oench* doctrine "favors the interests of depositors and creditors of a failed bank, who cannot protect themselves from secret agreements, over the interests of borrowers, who can." *Bell & Murphy & Assoc. v. Interfirst Bank Gateway*, 894 F.2d 750, 754 (5th Cir. 1990), *pet'n for cert. filed*, (No. 89–1893). Thus, neither a claim of lack of intent to deceive banking authorities nor a claim that the purported secret arrangement was not by its nature fraudulent is sufficient to defeat application of the *D'Oench* doctrine.

The plaintiffs' second argument to try to wiggle out of the grasp of *D'Oench* is that a partnership exists. *See The Royal Bank of Canada v. FDIC*, 733 F.Supp. 1091 (N.D.Tex.1990). However, there is no partnership agreement in evidence or any other credible evidence of a partnership. *Cf. Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351 (7th Cir. 1990). The equity participation agreement concerned one project and was limited to a fixed fee for each condominium unit sold. Under these circumstances, I must invoke the language of the First Circuit's case in *Local No. 48, supra* to the effect that the plaintiffs are relying on "conclusory allegations, improbable inferences, and unsupported speculation."

### B. *12 U.S.C. § 1823(e)*

■ This statute provides:

No agreement which tends to diminish or defeat the interest of the corporation [i.e., the FDIC] in any asset acquired by it under this section or Section 11 [12 U.S.C. § 1821, authorizing the FDIC to act as receiver], either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such an agreement:

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the Board of Directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said Board or Committee; and

(4) has been, continuously from the time of its execution, an official record of the depository institution.

The statute would obviously act to defeat the plaintiffs' claims since the alleged agreements are unwritten. However, the statute did not expressly apply to actions involving the FDIC as receiver until August 9, 1989. Prior to that date, the statute only applied to the FDIC in its corporate capacity. Therefore, the question exists as to whether the statute should be applied retroactively. Unfortunately for the plaintiffs, all courts that have directly ruled on this issue have ruled that the statute should have retroactive effect. See *FDIC v. Engel*, 746 F.Supp. 1223 (S.D.N.Y.1990); *RTC v. Dismuke*, 746 F.Supp. 104 (N.D.Ga.1990); *FDIC v. British–American Corp.*, 744 F.Supp. 116 (E.D.N.C.1990); *FDIC v. Sullivan*, 744 F.Supp. 239 (D.Colo.1990); *FDIC v. Carter*, 1990 WL 209626 (W.D.Okla. June 1, 1990); *FDIC v. Dalba*, 1990 WL 43750 (W.D.Wis. 1990 February 27, 1990). These courts generally balance the private expectations of the complaining party with the public interest in enforcing the new rule.[2] This balancing is consistent with First Circuit case law. See *Demars v. First Service Bank for Savings*, 907 F.2d 1237 (1st Cir. 1990). In this case, no manifest injustice would occur because the plaintiffs cannot assert that an agreement they knew would be unenforceable against the FDIC in its corporate capacity they expected to be enforceable against the FDIC in its capacity as receiver. On the other hand, there is a strong public interest in ensuring the solvency of banks.

### C. *The non-contract claims*

Plaintiffs employ a variety of legal theories besides breach of contract: negligent and intentional misrepresentation, fraud, breach of fiduciary duty, unfair trade practices, and violation of banking regulations. Plaintiffs maintain that these non-contract claims are not barred by *D'Oench*. They are wrong. The First Circuit recently made it crystal clear that all claims arising out of the alleged oral agreements are barred. In *Timberland Design, Inc., and William C. Barnsley v. First Serv. Bank for Savings*, 932 F.2d 46, 50 (1st Cir.1991), the Court stated:

> The district court correctly held that *D'Oench* bars defenses and affirmative claims whether cloaked in terms of contract or tort, as long as those claims arise out of an alleged secret agreement. *Timberland Design, Inc. [v. F.D.I.C.]*, 745 F.Supp. [784] at 789 [D.Mass.1990]. To allow the plaintiff to assert tort claims based on the oral agreement would circumvent the very policy behind *D'Oench*, and therefore, *D'Oench* is generally said to apply to tort claims. *See Beighley [v. F.D.I.C.]*, 868 F.2d [776] at 784 [5th Cir.1989]. Although not decided under *D'Oench*, the Supreme Court's decision in *Langley v. FDIC* supports this conclusion by holding that § 1823(e) bars fraud claims that are premised upon an oral agreement. 484 U.S. 86, 93 [108 S.Ct. 396, 402, 98 L.Ed.2d 340] (1987). We therefore conclude that *D'Oench* applies with equal force to tort claims arising out of secret agreements.

### III. CONCLUSION

The *D'Oench* doctrine and 12 U.S.C. § 1823(e) bars the plaintiffs' cause of action. Oral agreements cannot form the basis for claims against the FDIC. The FDIC is entitled to summary judgment.

---

**2.** These courts often rely on *Bradley v. Richmond School Bd.*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), where the court stated a court should apply the law then in effect "unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." No court has found any statutory directive or legislative history for this statutory amendment.