**FRANKLIN ASAPH LIMITED PARTNERSHIP, Plaintiff,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant.**

Civ. A. No. 91–1856.

United States District Court,
D. of Columbia.

April 30, 1992.

J. Christopher Kohn, Francis M. Toole, Lacy R. Harwell, Jr., Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM AND OPINION

REVERCOMB, District Judge.

Plaintiff is a commercial real estate developer that was financed by the National Bank of Washington (NBW); bank regulators declared NBW insolvent and subject to Federal Deposit Insurance Corporation receivership on August 10, 1990. The crux of plaintiff's complaint is that, after lending plaintiff $10.85 Million beginning in 1987 to build an office building in Old Town Alexandria, Virginia, NBW agreed in the months before entering receivership to an additional loan of $650,000, and "this subsequent ... Loan Increase became part of the Loan," an obligation which "the FDIC–Receiver and/or FDIC have refused to honor." Complaint Para. 9, 27. Plaintiff seeks a variety of relief on account of FDIC's refusal to extend the additional loan amount, including compensatory damages and interest, specific performance and a declaratory determination of no liability on the original loan obligations.

The FDIC has moved for dismissal of plaintiff's entire eight-count complaint under Rule 12(b)(6), Fed.R.Civ.P., on grounds that 12 U.S.C. 1823(e) and the related federal common law *D'Oench, Duhme* Doctrine bar plaintiff's action. FDIC argues that this bar operates because plaintiff fails to allege either that NBW made a written acknowledgment or commitment to Asaph to make the loan increase or that NBW ever prepared, finalized or executed documents for the loan.

The Court has considered the parties' pleadings on FDIC's motion to dismiss and heard oral arguments on April 23, 1992. For the reasons set forth below, the Court grants defendant FDIC's motion to dismiss.

*Rule 12(b)(6) Standard*

On a motion to dismiss under Rule 12(b)(6), the Court's inquiry essentially is limited to the content of the complaint, although items appearing in the record of

David H. Dickieson, Silverstein and Mullens, Washington, D.C., for plaintiff.

the case also may be taken into account. 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* Section 1356–1357 (1990). While the Court is under a duty to examine the complaint to determine if the allegations provide for relief on any possible theory, as a practical matter, a dismissal under Rule 12(b)(6) is appropriate in cases "in which the plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Id.* at 1357. The Court is to accept the plaintiff's description in the complaint of what happened to him along with any conclusions that can reasonably be drawn from that description. *Id.* "However, the court will not accept conclusory allegations concerning the legal effect of the events plaintiff has set out if these allegations do not reasonably follow from his description of what happened, or if these allegations are contradicted by the description itself." *Id.*

*Facts*

The complaint, pleadings and oral arguments reveal the following facts that the Court considers pertinent to the bar raised by 12 U.S.C. 1823(e), the related provision 12 U.S.C. 1821(d)(9)(A), and the *D'Oench, Duhme* Doctrine:

Plaintiff alleges, and FDIC does not dispute, that NBW made a construction loan for $10.2 Million to plaintiff Asaph on December 16, 1987, and that this amount was subsequently increased, sometime prior to June 1990, to $10.85 Million. Complaint Para. 8. Plaintiff has not appended to its complaint or opposition any documentation related to these loans; it alleges, however, that "Upon information and belief, the Loan [increase] was in writing, approved by NBW's Board of Directors or its loan committee," that "approval of the Loan was reflected in the minutes of the Board of Director's meeting, and/or the minutes of the loan committee," ... and that "the Loan was executed by NBW and Franklin Asaph contemporaneously with the approval or acquisition of the loan." Para. 11–13.

Plaintiff further alleges, at the focus of its complaint, that in June 1990, "Asaph requested and NBW agreed to increase its Loan in an amount equal to $650,000 to cover ... Asaph's projected increased costs for tenant buildout necessary to achieve 100% leaseup." Para. 19. Again, plaintiff provides no documentation related to this increase; rather, it alleges that "Upon information and belief, Franklin Asaph was advised that NBW real estate division review committee approved an increase to the Loan in the amount of $650,000. In addition, because the loan was larger than $5 Million, NBW's senior level committee considered and approved the increased Loan amount." Para. 20. "Upon information and belief, Franklin Asaph has been told that NBW's formal approval of the loan increase is properly documented in the corporate records of NBW." Para. 21. "NBW retained the law firm of Jones, Day, Reavis & Pogue to prepare the closing documents[,] and *closing with respect to the increased Loan amount was scheduled to occur during the week of August 13, 1990.*" Para. 22 (emphasis added). "On or about August 10, 1990, NBW was declared insolvent and closed by the Office of the Comptroller of the Currency ... and the FDIC was appointed receiver for NBW." Para. 25–26.

The FDIC argues that, even assuming the truth of these factual allegations, the most that plaintiff alleges is (1) a loan agreement with the National Bank of Washington ... (2) an unwritten, unexecuted agreement by NBW for additional financing, (3) the failure by NBW to close and fund the loan increase, and (4) FDIC–Receiver's subsequent refusal to close and fund the loan increase after its appointment as receiver for NBW. FDIC Reply at 1–2. The Court notes at the outset that it agrees with FDIC, *id.* at 12, that plaintiff attempts to bootstrap the alleged agreement for additional financing into the prior undisputed loan contracts by drawing the legal conclusion in its opposition to dismissal that "NBW agreed to increase the Loan by $650,000 in 1990 *which when approved by NBW's loan committee became part of the Loan.* (Complaint, Para. 19–21)." Asaph Opposition at 2, 13

(emphasis added). The Court rejects this attempt, first because the complaint alleges no factual basis—such as a contract or clause obligating NBW to loan more money under certain terms that were fulfilled by Asaph—for assuming a nexus between the $10.85 Million that NBW did loan and the June 1990 agreement to loan another $650,-000 [1]—and second because the legal conclusion of a preexisting, firm obligation of NBW directly contradicts plaintiff's other (and more plausible) assertion that NBW had not "agreed" until June 1990 to the $650,000 loan "increase," which had yet to go to closing as of August 10, 1990, and that a law firm had been retained precisely for the purpose of accomplishing that closing.

■ Plaintiff argues in the alternative, however, that "even the [loan] increase itself survives the requirements of section 1823(e)" because it

> was in writing—as reflected in the Bank's books and records (Complaint Para. 20 and 21) and in the closing documents (Complaint Para. 22). In addition, the loan increase was approved by NBW and executed through performance by the Plaintiff. As Franklin Asaph has alleged, it carried through on NBW's obligation to fund by performing acts indicating acceptance. (Complaint, Para. 23). Similarly, the loan committee of NBW approved the increase, (Complaint, Para. 20), and the approval is properly documented in NBW's files. (Complaint, Para. 21).

Opposition at 13. These arguments are illuminated by several observations. First, as noted, Paragraph 22 of the complaint makes clear that the "closing documents" referred to were prepared for a closing "scheduled to occur during the week of August 13, 1990" which never took place because of NBW's insolvency on August 10, 1990. Plaintiff advised the Court at oral argument that NBW informed Asaph *orally* that the loan increase had been approved. Second, plaintiff admits in a footnote that its theory of "execution by performance" of the plaintiff "has not been decided in this Circuit and presents an important issue of law for the Court's resolution." Opposition at 13 n. 12. However, plaintiff offers no authority to support its proposition that an agreement for a construction loan for $650,000 can be "executed" between a depository institution and a borrower based on detrimental reliance, the "performance" alleged by plaintiff in Paragraph 23 of the complaint, rather than through the usual sense of "execute" in this context, which in the Court's experience means "perform[ing] all necessary formalities, as to make and sign a contract, or sign and deliver a note," such as is done at a real estate closing.[2] Third, requisite to plaintiff's "execution by performance" theory is acceptance of its argument regarding NBW's preexisting "obligation to fund" the loan increase, an argument that the Court has rejected as unsupported by the complaint.

Having thus examined the complaint's factual assertions and drawn all reasonable inferences from them in favor of the plain-

---

1. Plaintiff also fails to plead facts to support his conclusion, Opposition at 3, that "the Defendants have admitted that once the $650,000 increase was approved by NBW, it became part of the loan. (Complaint 21)," or, *id.* at 26 n. 20, that "the Defendants have admitted that Franklin Asaph has a legally protected contract interest. (Complaint Para. 9, 15)." In fact, Paragraph 21 of the complaint alleges only that "NBW's formal approval of the Loan Increase is properly documented in the corporate records of NBW," while Paragraphs 9 and 15 allege respectively only that "Upon information and belief, once approved by NBW this subsequent $650,000 Loan Increase became part of the Loan," and that "The Loan was a bilateral agreement to which NBW was legally obligated to advance funding." The Court therefore dis-

regards these assertions as unfounded legal conclusions.

2. *Black's Law Dictionary* 509 (5th ed. 1979). *See Twin Const., Inc. v. Boca Raton, Inc.,* 925 F.2d 378, 383–84 (11th Cir.1991) (quoting *Black's Law Dictionary* and noting that "[f]or purposes of the present case [*i.e.,* enforceability of a lien subordination agreement against FSLIC], 'executed' can have . . . two meanings: (1) that *both* sides have fully performed any obligations contained in the agreement; and (2) that both sides have *signed* the agreement") (emphasis added). In this case, NBW did not perform fully, or at all, on the loan increase, and plaintiff has alleged no signed agreement.

tiff, the Court finds that plaintiff has alleged, at most: (1) loans from the National Bank of Washington for $10.85 Million (2) a subsequent agreement by NBW for additional financing of $650,000 that the bank apparently communicated only orally to Asaph, (3) internal documentation evidencing NBW's approval of this additional financing agreement, (4) NBW's retention of counsel to prepare closing documents for the additional loan, (5) failure by NBW to close and fund the loan increase, (6) reliance by Asaph to its detriment on the unclosed loan agreement, (7) FDIC–Receiver's subsequent refusal to close and fund the loan increase after its appointment as receiver for NBW, and (8) injury related solely to the unfunded $650,000 loan agreement.

*Sections 1823(e) and 1821(d)(9)(A) and the D'Oench, Duhme Doctrine*

■ Having fixed these allegations, the Court may proceed to consider the FDIC's argument that plaintiff's action is barred. The Court is aided greatly in this effort by the recent, comprehensive analysis of 12 U.S.C. 1823(e) and 1821(d)(9)(A) and the *D'Oench, Duhme* Doctrine provided by Judge Royce Lamberth in *In re National Bank of Washington Commercial Paper Litigation*, No. 91–0626, slip op., 1992 WL 73135 (D.D.C. March 11, 1992) (*"In re NBW"*). Reference to this decision allows the Court to summarize briefly here that the doctrine arose in 1942 in the Supreme Court's decision in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and has gradually expanded to insulate the FDIC, in both its "receiver" and "corporate" capacities, from liability in lawsuits in which, typically, a borrower seeks to avoid payment of its note by asserting a superseding oral side agreement with the lender either as a defense or as an affirmative counterclaim.[3]  *Id.* at 8–

11. The *D'Oench* Doctrine formed a precursor to 12 U.S.C. 1823(e), which Congress passed in 1950 to bar claims against the FDIC in its corporate capacity that did not meet the statute's stringent writing requirements. Congress amended the statute in 1989 as part of the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) to extend its application to the FDIC in its capacity as receiver of a failed bank.[4]  *Id.* at 11. Section 1823(e) provides that

> No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as a security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
>
> (1) *is in writing,*
>
> (2) was *executed* by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
>
> (4) has been continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. 1823(e) (1988) (emphasis added). It has been held that a claimant must satisfy all elements of Section 1823(e) before an agreement may be enforced against the FDIC, *see FDIC v. Manatt*, 922 F.2d 486, 488 (8th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 2889, 115 L.Ed.2d 1054 (1991), and the Court finds that the statute's use of the conjunctive supports this construction. In

---

**3.** The *D'Oench* Court held that the doctrine applies to bar claims by anyone who "lends himself to a scheme or arrangement whereby the banking authority ... was or was likely to be misled" by an undocumented agreement. 315 U.S. at 460, 62 S.Ct. at 681.

**4.** FDIC notes in its Memorandum in support of its Motion to Dismiss, at 4, that "[i]n general

terms, FDIC–Corporate acts as the insurer of bank deposits under 12 U.S.C. 1821(a)" while "FDIC–Receiver ... manages the assets and liabilities of failed institutions, and wields a variety of statutory powers in connection with that function, including the authority to repudiate contracts."

the only Supreme Court case to consider Section 1823(e), the Court indicated that the term "agreement" in the statute should be interpreted broadly. *See Langley v. FDIC,* 484 U.S. 86, 92–93, 108 S.Ct. 396, 401–402, 98 L.Ed.2d 340 (1987).

FIRREA also added Section 1821(d)(9)(A) to the protections afforded to the FDIC. *In re NBW* at 13. That statute provides that

> any agreement which does not meet the requirements set forth in section 1823(e) of this title shall not form the basis of, or substantially comprise, a claim against the receiver or the Corporation.

12 U.S.C. 1821(d)(9)(A) (1991). Few courts have yet interpreted this provision, and its meaning is not altogether clear, since virtually no legislative history underlies it, and post-FIRREA courts barring claims against the FDIC have relied almost exclusively on Section 1823(e) and *D'Oench,* often without distinguishing between the two. *In re NBW* at 17–18, 33–34. Judge Lamberth, however, has observed that "Section 1823(e) sets forth procedures for the FDIC's dealings with *creditors,*" while "Section 1821(d)(9)(A) was enacted as part of FIRREA's provisions regarding the *FDIC's role as receiver,* i.e., *when FDIC would be defending against affirmative claims." Id.* at 35–36 (emphasis added). As to the interplay between the two statutes and the doctrine, he found after extensive consideration that *D'Oench* forms

> a safety net which Congress has left to insure that the specific wording of the statute [1823(e)] does not prevent the true application of Congress' policies. Indeed, one of the principal purposes behind FIRREA's amendment of Section 1823(e) and creation of Section 1821(d)(9)(A) was to extend further protection to the federal government when stepping in for failed financial institutions."

*Id.* at 23. While in its area of application *D'Oench* embodies a less stringent writing requirement than does Section 1823(e), *id.* at 38–39 & n. 23, Section 1821(d)(9)(A) incorporates the "requirements" of Section 1823(e) by reference, including its stringent writing requirement, *id.* at 34–35, as well as its "asset" requirement, which provides that FDIC must have an "interest ... in a[n] asset acquired by it" that is "dimin-ish[ed] or defeat[ed]" by the agreement at issue in order for the statutory bars to apply.

In this case, the FDIC argues that Section 1823(e) applies because the "agreement" Asaph seeks to enforce is the June 1990 pledge to loan $650,000, the "asset" is the underlying loan for $10.85 Million, now held by FDIC, and allowing Asaph's claim would permit it to offset the amount still owed on the underlying loan by $650,000, thus diminishing FDIC's interest in the "asset." Reply at 11. Although the Court finds a certain irony in this argument, as does plaintiff, Opposition at 10, because FDIC's contention of inadequate pleading by plaintiff is based largely on the *absence* of a link between the underlying loans and the NBW's alleged promise of an increase, the Court nonetheless finds that Section 1823(e)'s asset requirement is met because the underlying loans are " 'particular, identifiable asset[s]' " in which FDIC has acquired an interest as a receiver, *see id.* at 30–31, and because these assets—essentially accounts receivable—are identifiable solely to the plaintiff, whose own exhibits show it be or to have been in arrears in paying. *See* Opposition at Attachments B, C, and D (dunning letters dated September, October, and December 1990 from FDIC to Asaph Limited Partnership).

Moreover, *In re NBW* held that, while the term "asset" within Section 1823(e) should not be "interpreted so broadly as to encompass *any* liability or other existing condition which affects the financial condition of the receivership," it is "appropriate that 'asset' *should* refer to ... promises to make future loans." *Id.* at 32 (emphasis added). Several cases support application of this view to the facts presented here. *Timberland Design v. First Service Bank for Savings,* 932 F.2d 46, 49–50 (1st Cir. 1991) (*D'Oench* Doctrine protects FDIC from borrower's affirmative claims based on an alleged oral agreement by bank to lend additional money in the future; Section 1823(e) expressly not considered);

*Bowen v. FDIC*, 915 F.2d 1013, 1014–16 (5th Cir.1990) (same; Section 1823(e) expressly not considered); *Tuxedo Beach Club Corp. v. City Federal Savings Bank*, 749 F.Supp. 635, 642 (D.N.J.1990) (same; agreement "clearly … unenforceable … within section 1823(e) and the *D'Oench, Duhme* Doctrine").

Based on this authority, the Court is satisfied that plaintiff's alleged loan increase agreement would, within the meaning of Section 1823(e), diminish the FDIC's interest in an asset it holds as receiver. In accordance with the observation in *In re NBW* that Section 1821(d)(9)(A) was intended to cover FDIC in its capacity as receiver—"i.e., when FDIC would be defending against affirmative claims"—the Court finds it appropriate to apply primarily this statute to the alleged agreement, in conjunction with Section 1823(e), which defendant FDIC primarily relies upon. The Court notes that application of either statute imposes on the plaintiff the strict writing requirement of Section 1823(e)(1), as well as the requirement of 1823(e)(2) that the writing have been "executed" by the depository institution and the plaintiff. In addition, application of either statute obviates the need to apply the *D'Oench* Doctrine; the Court does not consider whether *D'Oench* might also bar liability on the facts alleged.

▉▉▉▉ The Court has already discussed and rejected, *supra* at 405 and n. 2, plaintiff's argument that the alleged loan increase was "executed." As noted, plaintiff argues that Section 1823(e)'s writing requirement is met because written evidence of the agreement may be found in NBW's "books and records," "in the closing documents" that were not executed, and "in NBW's files" reflecting the loan committee's approval of the increase. Opposition at 13. FDIC argues that plaintiff has "been unable to allege in good faith the existence of an executed written agreement to extend additional financing" and that "this Court should not permit … Asaph to cobble together its agreement on a piecemeal basis." Reply at 14. The Court agrees. *See In re NBW*, slip op. at 12,

citing *FSLIC v. Gemini Management*, 921 F.2d 241, 245 (9th Cir.1990) ("*D'Oench* and its progeny require a clear and explicit written obligation"; letter of intent to lend insufficient); and *Beighley v. FDIC*, 868 F.2d 776, 783 (5th Cir.1989) (holding that "numerous" executed documents which, when read together evidence an agreement to lend, do not meet the "certain and 'categorical'" requirements of Section 1823(e)). The Court also agrees that additional discovery on this point seems unwarranted, since "[h]ad [plaintiff] signed a written agreement with [NBW], [plaintiff] 'would obviously be aware of the fact and (would be) capable of alleging it specifically.'" *Oliver v. Resolution Trust Corp.*, 955 F.2d 583, 585 (8th Cir.1992); *see FSLIC v. Cribbs*, 918 F.2d 557, 560 (5th Cir.1990) (permitting plaintiff to undertake extensive discovery absent any indications he could assert a viable defense based on documents he sought would serve no useful purpose); *FDIC v. Virginia Crossings Partnership*, 909 F.2d 306, 309–10 (8th Cir.1990); *accord Tuxedo Beach, supra*, 749 F.Supp. 635, 642–43 and n. 4 (permitting discovery of alleged documents but noting that "these documents, if they exist, must together satisfy the requirements of section 1823(e) in order to bind" federal receiver).

Finally, the Court acknowledges plaintiff's additional argument that

> [i]f, as Plaintiff alleges, the increase became part of the Loan and the letters [dunning letters, Exhibits B, C, & D, referred to above] were sent on behalf of FDIC–Corporate reaffirming the Loan's obligations, then FDIC–Corporate had an independent duty to honor the agreement. Thus, failure to honor the Loan made FDIC–Corporate liable for its *own* breach (as assignee), *not* for the breach of FDIC–Receiver [which was caused by FDIC–Receiver's "failure to honor the loan"].

Opposition at 7–8. FDIC raises a number of arguments in response to this contention, but the Court need not consider them, in that it has rejected plaintiff's underlying premise—that plaintiff has adequately alleged that "the increase became part of the Loan" for purposes of this suit. As noted,

Section 1821(d)(9)(A) bars actions against "the receiver or the Corporation" based on agreements not in compliance with Section 1823(e)'s requirements. Likewise, the complaint and plaintiff's opposition make clear that Asaph's due process, contract impairment, and taking claims are based on FDIC's demands for repayment of the loans extended by NBW "despite the repudiation or disallowance of the Loan Increase" and the "mutual obligations of the Loan Agreement." Complaint Para. 90–91; Opposition at 26 ("Defendant wants Plaintiff to repay the Loan in full while rendering less than full performance on their obligations"). Here again, the "mutual obligations" rejected by the Court form the basis of the claims.

For the foregoing reasons, the Court will grant defendant FDIC's motion and dismiss plaintiff Asaph's complaint in its entirety, pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a cause of action upon which relief can be granted.