968 F.2d 1220
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
BAKERSFIELD CONVENTION CENTER HOTEL ASSOCIATES, aka
Bakersfield Convention Center Associates, Ltd.,
Plaintiff-Appellant,
and
Aircoa Hospitality Services, Inc., Plaintiff,
v.
RESOLUTION TRUST CORPORATION, Defendant-Appellee.
 No. 91-55712.
 United States Court of Appeals, Ninth Circuit.
 Submitted July 8, 1992.*
Decided July 15, 1992.
 
 1
 Before SNEED and D.W. NELSON, Circuit Judges, and ROLL,** District Judge.
 
 
 2
 MEMORANDUM***
 
 
 3
 The Bakersfield Convention Center Hotel Associates ("BCCHA") appeal a grant of summary judgment in favor of the Resolution Trust Corporation ("RTC") in its capacity as receiver for the failed Mercury Savings and Loan Association. We affirm.
 
 I.
 FACTS AND PROCEEDINGS BELOW
 
 4
 This case has its origins in a state court suit for breach of contract filed by BCCHA against Mercury. Soon after BCCHA filed suit, the RTC was appointed receiver of Mercury. The RTC removed the action to federal court and, once there, moved for summary judgment based on the D'Oench, Duhme doctrine and its statutory counterpart found at 12 U.S.C. § 1823(e). The district court granted the RTC's motion on May 1, 1991, and BCCHA appeals.[1]
 
 
 5
 The facts are as follows. On February 25, 1987, BCCHA and Mercury entered into a loan agreement for the development of a hotel complex in Bakersfield, California. Mercury agreed to loan BCCHA a maximum amount of $15 million. The agreement expressly provided that the construction completion date would be 18 months after the loan closed. Failure to complete construction by the 18 month deadline would, by the loan agreement's terms, constitute a default. In that event, Mercury would have "no further obligation to disburse" more funds and would be released from "any and all obligations" to BCCHA.
 
 
 6
 On February 28, 1987, BCCHA deposited $5 million of equity into a special account at Mercury, as required in the loan agreement. The official closing date was March 11, 1987, making the construction deadline September 11, 1988. Construction was planned to begin in June 1987.
 
 
 7
 There were delays from the outset, however, and construction did not begin until the end of 1987. At that time, Mercury began to release funds from the $5 million equity account to pay for the construction. No loaned monies were released.
 
 
 8
 Concerned about the implications the delay might have on the loan agreement, a BCCHA partner arranged a meeting with Mercury for January 24, 1988. According to BCCHA, Mercury assured them at that meeting that there would be "no problem" with a loan extension. The meeting was followed by another on April 14, 1988. Again, according to BCCHA's complaint, Mercury "orally agreed" to modify the loan agreement.
 
 
 9
 Next, on April 25, 1988, a Mercury representative sent a BCCHA partner a letter which outlined terms of the proposed loan extension agreement. The letter plainly stated, however, that it was "not a commitment to modify" the original agreement. According to BCCHA, Mercury told them that an official draft of the proposed extension agreement must wait for approval of Mercury's loan committee. The committee approved the loan extension on May 25, 1988. This is reflected in written and signed minutes of the committee meeting. BCCHA alleges that a draft extension agreement was then sent to them on June 1, 1988.
 
 
 10
 With draft in hand and a "commitment" secured, BCCHA continued construction in earnest. Still, only equity funds were drawn. On July 15, 1988, another crucial meeting took place. Mercury once again, relates BCCHA, orally agreed to the extension. Mercury continued to disburse equity funds and routinely inspected the job site. When the equity funds were about to be exhausted, Mercury backed out. On December 1, 1988, Mercury notified BCCHA by letter that it was in default under the terms of the loan agreement. Between January 24, 1988, when BCCHA and Mercury began extension talks, and December 1, 1988, when Mercury formally ended the relationship, no official extension agreement was ever signed by the parties.
 
 II.
 DISCUSSION
 
 11
 The primary question on appeal is whether the RTC, in its capacity as receiver of a failed thrift, may raise the D'Oench, Duhme shield to deny the existence of Mercury's oral commitment to extend the loan agreement. BCCHA argues that D'Oench, Duhme does not apply to the facts of this case. We are convinced, however, that FSLIC v. Gemini Mgmt., 921 F.2d 241 (9th Cir.1990), has already extended D'Oench, Duhme to this situation. We, therefore, affirm and apply D'Oench, Duhme to the benefit of the RTC.
 
 
 12
 The D'Oench, Duhme doctrine, as it has become known, began with the 1942 Supreme Court case, D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447. In that case, a brokerage firm executed a note in favor of a bank for no consideration, and with the understanding that the note would never be called for payment.[2] The bank later failed, and the FDIC, who had acquired the note, then brought suit to collect. Implementing the sound federal policy to "protect [the FDIC] and the public funds which it administers against misrepresentations as to the securities or other assets in the portfolios of the banks which [the FDIC] insures," id. at 457, the Court refused to allow the brokerage firm to raise the "secret agreement" as a defense to its liability on the note, id. at 461.
 
 
 13
 In Gemini, this court observed that, "[a]s the Savings and Loan crisis in which this nation is mired continues to unfold, regulators are discovering abuses the D'Oench Court could not have imagined or predicted." 921 F.2d at 245. Gemini involved an alleged informal promise by a failed thrift to fund a construction project with $445,000 more than the $1.1 million it had already extended. When the FSLIC sought to collect the outstanding $1.1 million, Gemini Management counterclaimed for damages based on the defunct thrift's breached promise to loan the additional $445,000. Gemini alleged that the project failed as a result, and that Gemini could not therefore meet the initial $1.1 million obligation.
 
 
 14
 The Gemini court affirmed the summary dismissal of the counterclaim, thereby expanding the application of D'Oench, Duhme. The court stated: "If the 'agreement' to fund the ... project was not reflected in the [failed thrift's] records, it is clear that the FSLIC would have been misled about [the thrift's] financial condition." Id. at 244. Only a clear and explicit "bilateral obligation which appears in the bank's records," held the court, could escape D'Oench, Duhme. Id. at 245 (quoting FSLIC v. Two Rivers Assocs., 880 F.2d 1267, 1275 (11th Cir.1989) (emphasis removed).
 
 
 15
 In this case, it is plain that the purported oral agreement to extend the construction deadline was not a written, bilateral agreement reflected in Mercury's records. To the contrary, it was the kind of "secret" deal by Mercury officials against which the Gemini court raised the D'Oench, Duhme shield. The fact that no actual Mercury monies were extended, or that BCCHA is only seeking to share in Mercury's "assets," makes no difference. When the RTC took over Mercury, its evaluation of Mercury's financial condition should rely only on signed loan agreements. The RTC could not determine, based on Mercury's records, any commitment to extend the BCCHA loan past the original deadline. It is clear that the RTC was misled, and would be hampered in its efforts to resolve the Mercury failure were BCCHA permitted to enforce its secret claim. As in Gemini, BCCHA "had every opportunity to insist that the agreement for the [deadline extension] be stated explicitly." Id. Had it done so, as prudent business practice would seem to demand, BCCHA could have avoided at least a portion of the loss it has suffered.[3]
 
 
 16
 The RTC's request for sanctions, costs, and attorney's fees is denied. Although without merit, this appeal is not frivolous.
 
 
 17
 AFFIRMED.
 
 
 
 *
 The panel finds this case appropriate for submission without argument pursuant to 9th Cir.R. 34-4 and Fed.R.App.P. 34(a)
 
 
 **
 Honorable John M. Roll, United States District Judge for the District of Arizona, sitting by designation
 
 
 ***
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 We have jurisdiction under 28 U.S.C. § 1291. We review the grant of summary judgment de novo, and apply the same test as that employed by the lower court under Fed.R.Civ.P. 56(c). See Thomas v. Douglas, 877 F.2d 1428, 1430 (9th Cir.1989)
 
 
 [2]
 The purpose of the arrangement was to make the bank's books appear sounder than they really were. The brokerage firm had previously sold the bank bonds which later defaulted. Rather than carry the defaulted and worthless bonds as an asset, the bank secured the deceptive note. Thus it appeared as if the bank carried a solid asset (the note) to cover the loss on the bonds, a deception made apparent by the secret agreement that the brokerage firm would never have to pay on the note
 
 
 [3]
 BCCHA's assertions that, by so holding, we have violated BCCHA's rights to due process or have allowed for an unconstitutional taking, are meritless. See Campbell Leasing, Inc. v. FDIC, 901 F.2d 1244, 1248 (5th Cir.1990)