RESOLUTION TRUST CORPORATION, in its capacity as Receiver of Midwest Federal Savings Bank of Minot; et al., Counter–Defendants/Appellants,

v.

MIDWEST FEDERAL SAVINGS BANK OF MINOT, a federally chartered savings association, as Trustee; Centennial Estates, Inc.; La Plata Investors; John F. Nolan; Gregory M. Beck; Gerald G. Wilson; TMKB Associates; John S. Tighe; William D. McBrearty; Michael J. Kiley, et al., Defendants,

and

Orangegate Investors, a California limited partnership, Counter–Claimant/Appellee.

RESOLUTION TRUST CORPORATION, in its capacity as Receiver of Midwest Federal Savings Bank of Minot, Plaintiff–Appellee,

v.

MIDWEST FEDERAL SAVINGS BANK OF MINOT, a federally chartered savings association, as Trustee, Defendant,

and

Orangegate Investors; Centennial Estates, Inc.; La Plata Investors; John F. Nolan; Gregory M. Beck; TMKB Associates; Gerald G. Wilson; Main St. Investors; Royce T. Breazeale, Jr.; Michael J. Kiley, et al., Defendants–Appellants.

Nos. 91–56300, 92–55350.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 6, 1993.

Decided Sept. 21, 1993.

Amended Sept. 23, 1994.

J. Michael Schwartz, Popham, Haik, Schnobrich & Kaufman, Minneapolis, MN, for plaintiff-appellant.

Stephen C. Drummy, Lawrence M. Burek, Drummy, King & White, Costa Mesa, CA, for defendants-appellants.

Paul B. George, Stuart W. Price, McDermott, Will & Emery, Newport Beach, CA, James H. Casello, Beck & Casello, Laguna Hills, CA, for defendants-appellants.

---

## ORDER

The opinion filed September 21, 1993 is amended as follows: [Editor's Note: Amendments incorporated for purposes of publication].

With the above amendments, the panel has voted to deny the petition for rehearing and to reject the suggestion for rehearing en banc.

The full court has been advised of the amendments to the opinion and of the suggestion for rehearing en banc, and no judge requested a vote. Fed.R.App.P. 35(b).

The opinion is amended as set forth in this order, the petition for rehearing is denied, and the suggestion for rehearing is rejected.

SO ORDERED.

Appeals from the United States District Court for the Central District of California.

Before: HALL, WIGGINS and TROTT, Circuit Judges.

TROTT, Circuit Judge:

### I

This case involves two separate appeals. In No. 91–56300, the Resolution Trust Corporation, as receiver for Midwest Federal Savings Bank of Minot, appeals the district court's reformation of a loan agreement between Midwest Federal Savings Bank, the lender, and Orangegate Investors, a limited partnership, and several named individuals, collectively the borrowers. In No. 92–55350, the borrowers appeal the district court's denial of their requests for attorneys' fees. We have jurisdiction to hear these matters pursuant to 28 U.S.C. § 1291 (1988), and we affirm the district court in both.

### II

### FACTS

A. *History of the Loan*

In 1984, Orangegate Investors, a California limited partnership ("Orangegate"), purchased an office building in Garden Grove, California (the "Property"). By early 1985, Orangegate was required to refinance the original underlying loans on the Property as they had become due and payable by their own terms. Orangegate sought an $8 million permanent loan to refinance a $6.5 million debt on the Property.

Orangegate entered into negotiations with Midwest Financial Services Mortgage Corp. ("MFS"), a wholly-owned subsidiary of Midwest Federal Savings Bank of Minot ("Midwest Bank") conducting business in California. Orangegate requested MFS provide nonrecourse financing in order to reap tax benefits for the limited partnership.

On April 16, 1985, MFS issued a commitment letter to Orangegate ("Commitment Letter"). In this letter, MFS committed to

"fund a permanent loan" on the Property in the amount of $8 million. The letter clearly provided for the loan to be "none [sic] recourse," but required additional security of $1 million in the form of a personal guaranty from John Joseph. The partners of Orangegate signed the Commitment Letter as directed and returned a signed copy to MFS along with a check for a $40,000 commitment fee.[1] The Commitment Letter was signed by Orangegate prior to its stated expiration date of May 31, 1985.

On May 21, 1985, at a meeting held at the office of Midwest Bank in Minot, North Dakota, the Board of Directors of MFS approved the Orangegate loan as a "nonrecourse" loan. The loan form submitted to the board at the May 21 meeting reflects the loan's nonrecourse status. A record of this approval made in the minutes of the meeting clearly indicates the loan was approved as nonrecourse.

By letter dated June 27, 1985, MFS informed Orangegate that MFS had approved the loan. This letter, however, failed to mention either the nonrecourse term or Joseph's personal guaranty. By letter dated July 1, 1985, MFS directed its outside attorney to draw up the loan papers for the Orangegate loan. In this letter, however, MFS failed to direct its attorney to include a nonrecourse term in the documents. MFS did direct the attorney to include additional documents to reflect other special provisions of the loan including Joseph's personal guaranty.

In a letter to Orangegate dated July 2, 1985, MFS amended the June 27 approval letter by noting a correction in the monthly payment amount. MFS sent Orangegate a second approval letter on July 8, 1985, which was identical to the June 27 letter except for the change in the monthly payment amount called to Orangegate's attention in the July 2 letter. The loan documents prepared by MFS's attorney did not contain a nonrecourse provision, but did contain Joseph's personal guaranty. Nevertheless, all the borrowers signed the documents. MFS made and funded the loan.

At the time of making the loan, MFS was a subsidiary of Midwest Bank. However, on December 27, 1985, Midwest Bank acquired what can best be described as a "participation interest" in the loan from MFS. This purchase of a participation interest in the loan by Midwest Bank is noted in the bank's Board Minutes from January 14, 1986.[2]

Significant to the result in this case is the particular nature of the agreement by which Midwest Bank acquired its interest in the loan. The agreement (in evidence as Trial Exhibit # 39) provided in part:

> Upon Buyer's [Midwest Federal Savings Bank] payment of the purchase price for any participating ownership interest in any loan, Buyer shall immediately become vested, to the extent of its participating interest, with beneficial ownership of the loan and any and all of the documents of every nature in the possession of the Seller relating to such loan. *Seller [MFS] thereafter shall hold such loan and documents* as trustee for the benefit of all owners of participating interests to the extent of their beneficial interests. . . . Any beneficial owners or such owners' representative, *including the Federal Home Loan Bank Board, the Federal Savings and Loan Insurance Corporation, and their examiners or supervisory agents, shall have the right at any reasonable time during the normal business hours to request and have access to and examine any and all books, records and documents relating to any loan in which it has a participating interest or*

---

1. At this time, neither Centennial Advisors, Inc., nor John Joseph were partners in Orangegate. Centennial became a partner in the course of acquiring the loan, while Joseph never became a partner. The Commitment Letter was signed by John Joseph, as President of Centennial Advisors, Inc., a general partner in Orangegate; William McBrearty, Michael Kiley, John Tighe, and Ronald Brown, partners in TMKB Associates, a California general partnership, which also was a general partner in Orangegate; Royce Breazeale, David Tice, Stanley Gardner, partners in Main Street Investors, a California general partnership; and John Nolan, Gregory Beck, and Gerald Wilson, partners in La Plata Investors, a California general partnership.

2. Likewise, in May, 1988, Windtree Mortgage Company ("Windtree") replaced MFS as the servicer of the loan.

*relating to any of the matters covered by this Agreement.* (Emphasis added).

In 1989, Midwest Bank was placed into receivership by the United State Department of the Treasury Office of Thrift Supervision ("OTS"). Subsequently, OTS created a new entity to replace Midwest Bank ("new association"), and appointed the Resolution Trust Corporation ("RTC") as receiver for Midwest Bank and conservator for the new association. As conservator of the new association,[3] RTC acquired the final Orangegate loan documents, none of which contained a nonrecourse provision. Upon review of these loan documents, RTC determined Orangegate was in default under the terms of the loan, and the collateral, the Property, was worth approximately $3 million less than the balance of the loan. RTC's demand for cure and repayment was refused by Orangegate.

## B. *Litigation*

Thereafter, on November 16, 1990, RTC filed suit against Orangegate, Joseph and others to foreclose upon the loan and collect on the personal guarantee. Defendants Kiley, Centennial Estates, Inc., John Joseph, and West Coast Realty Finance, and La Plata Investors, Nolan, Beck, Wilson, Main Street Investors, Breazeale, Tice, and Gardner (collectively "Answering Defendants") filed timely general answers to RTC's Complaint.

On January 10, 1991, the Answering Defendants requested RTC turn over all bank documents concerning the loan. The Answering Defendants took the position that the loan was nonrecourse despite the lack of a nonrecourse provision in the final loan documents. Subsequently, RTC turned over two boxes of documents which purportedly were copies of Midwest Bank's records. However, the files actually were from Windtree, the loan servicer. The records from Windtree contained the only three documents involved in this case which mention the nonrecourse provision: the April 16 Commitment Letter, the MFS Board Submission form, and the minutes from the MFS's Board Meeting on May 21, 1985, at which the MFS Board had approved the Orangegate loan. Later, RTC produced actual bank records which did not contain any document that included the nonrecourse provision. RTC concedes, however, the Board Submission Form and a copy of the minutes from the MFS's May 21, 1985, Board meeting were found in the records of MFS.

On February 4, 1991, Centennial, Joseph, and West Coast Realty Finance filed for summary judgment and sought a ruling that the loan was nonrecourse. The rest of the Answering Defendants joined in the summary judgment motion. In its order filed March 8, 1991, the district court rejected the Answering Defendants' interpretation of the loan documents. The district court held the Answering Defendants' attempt to include the nonrecourse provision into the final fully-integrated loan documents was barred not only by the parol evidence rule, but also by the *D'Oench* doctrine, *D'Oench Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and 12 U.S.C. § 1823(e). This doctrine places limits on the use to which "side deals" can be put to defeat obligations created in documents on file in a bank. Finding that a question may exist as to whether the common-law *D'Oench* doctrine itself would preclude the addition of the nonrecourse provision in the instant case, however, the district court concluded § 1823(e), the *D'Oench* doctrine's statutory counterpart, surely precluded the term because the April 16 Commitment Letter was not approved by the board of the lending institution, Midwest Bank, but by the board of its wholly-owned subsidiary, MFS. The approval of the Commitment Letter by the board of MFS, the court held, "falls short of the requirements of the statutory *D'Oench* doctrine."

On March 5, 1991, defendant Orangegate, which had yet to file an answer to the original complaint, filed an answer and counter-

---

**3.** By September 21, 1990, however, the new association also failed, and was placed into receivership under RTC. As the receiver for the new association, RTC commenced the underlying suit to foreclose on the Orangegate loan.

claim.[4] The counterclaim sought reformation of the terms of the loan agreement to include a nonrecourse provision, and the counterclaim alleged a mutual mistake by the parties.

On March 11, 1991, RTC filed its motion for summary judgment based on the court's March 8 order holding the loan to be recourse. At a hearing on April 8, 1991, the district court noted that the reformation question was not addressed by the March 5 order, and that a separate hearing was required on the counterclaim. RTC then filed a motion to dismiss Orangegate's reformation counterclaim on a variety of grounds including lack of subject matter jurisdiction, the *D'Oench* doctrine, 12 U.S.C. § 1823(e), and Orangegate's late filing of its answer.

Prior to ruling on RTC's motion for summary judgment, Centennial, Joseph, and West Coast Realty Finance moved to reconsider the court's March 8 order. The district court held a subsequent hearing on June 24, 1991. In that hearing, the district court ruled from the bench that (1) Orangegate, Centennial, Michael Kiley and TMKB were liable under the terms of the loan, subject to possible reformation; (2) Joseph was liable on his personal guaranty; and (3) Centennial's motion for reconsideration was denied.

The district court then held a bench trial on July 11, 12, 15 and 23, 1991, to determine whether the terms of the contract should be reformed to include a nonrecourse provision. Following trial, the district court concluded Orangegate had demonstrated by clear and convincing evidence that (1) the parties' failure to include the nonrecourse provision in the final loan documents was the result of a mutual mistake, and (2) the parties had intended this loan to be nonrecourse. Further, the district court changed its analysis of Orangegate's main contention and concluded that the reformation of the loan agreement was not precluded by the *D'Oench* doctrine, as codified in 12 U.S.C. § 1823(e). The district court then reformed the loan documents to include a nonrecourse provision, and granted RTC both foreclosure on the deed of

trust to the Property and judgment against Joseph on his personal guaranty. RTC filed a timely notice of appeal on October 3, 1991.

### C. *Attorneys' Fees*

Meanwhile, Orangegate and the Answering Defendants filed notices on September 27, 1991, of their intention to move the district court for an order awarding the borrowers attorneys' fees and expenses. After an initial hearing on the motion held October 28, 1991, the district court sought from the parties additional briefing on several related issues. A second hearing was conducted on November 25, 1991, and again the district court sought additional briefing. Finally, the district court issued its order entered February 19, 1992, which denied the borrowers' motion. The court held the borrowers were not the "prevailing parties" in the suit under either California or federal common law and, therefore, were not entitled to an award of attorneys' fees. *Id.* The borrowers filed their timely notice of appeal on March 18, 1992.

### III

### JURISDICTION

RTC argues the district court lacked subject matter jurisdiction to adjudicate Orangegate's "counterclaim" for reformation. Specifically, RTC contends Orangegate should have exhausted its administrative remedies under 12 U.S.C. § 1821(d) prior to bringing its counterclaim in federal district court. The existence of subject matter jurisdiction is a question of law we review de novo. *DeNieva v. Reyes*, 966 F.2d 480, 482 n. 1 (9th Cir.1992).

Section 1823(d)(13)(D) provides:

Limitation on judicial review. Except as otherwise provided in this subsection, no courts shall have jurisdiction over—

(i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Cor-

---

4. Orangegate claims the parties had agreed to extend the time for Orangegate Investors to file

its response, a claim not disputed by the RTC.

poration has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or

(ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

12 U.S.C. § 1823(d)(13)(D). This section was enacted as part of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1821(d). FIRREA clearly applies to the RTC: "the RTC has 'the same powers and rights to carry out its duties with respect to [depository institutions insured by the FSLIC] as the [FDIC] has under ... [12 U.S.C.A. §§ 1821, 1822, and 1823]....' (12 U.S.C. § 1441a[b][4])." *Circle Indus. v. City Federal Savings Bank,* 749 F.Supp. 447, 451 (E.D.N.Y.1990), *aff'd,* 931 F.2d 7 (2d Cir. 1991).

FIRREA "grants the [RTC], as receiver, broad powers to determine claims asserted against failed banks. 12 U.S.C. § 1821(d)(3)(A)." *Henderson v. Bank of New England,* 986 F.2d 319, 320 (9th Cir. 1993). As part of this claims process, claims against the failed financial institutions must be filed first with the receiver, in this case the RTC. *Id.* "If the claim is disallowed, or if the 180 days expire without a determination by the [RTC], then the claimant may request further administrative consideration of the claim, or seek judicial review. 12 U.S.C. § 1821(d)(6)." *Id.*

FIRREA not only created this claims procedure, but also required its exhaustion prior to granting jurisdiction to the district courts over those claims. *Abbott Bldg. Corp., Inc. v. United States,* 951 F.2d 191, 194 n. 3 (9th Cir.1991). The Ninth Circuit recently explained the jurisdictional limitations created by FIRREA:

[FIRREA] contains no provision granting federal jurisdiction to claims filed after a receiver is appointed but before administrative exhaustion. Section 1821(d)(13)(D) strips all courts of jurisdiction over claims made outside the administrative procedures of section 1821....

A claimant must therefore first complete the claims process before seeking judicial review. The statute bars judicial review of any non-exhausted claim, monetary or non-monetary, which is "susceptible of resolution through the claims procedure."

*Henderson,* 986 F.2d at 320–21. (citations and quotations omitted).

Under *Henderson,* therefore, claims against a failed savings and loan first must be presented to the RTC through the administrative procedures established in FIRREA. Nevertheless, Orangegate contends the district court did have subject matter jurisdiction over its counterclaim for reformation, because a counterclaim for reformation is not the type of claim for monetary relief envisioned by the administrative review procedures set forth in FIRREA. Having reviewed both § 1821(d)(13)(D) and the nature of Orangegate's counterclaim, we agree the district court properly exercised subject matter jurisdiction in this case.

■ First, we note the fact that Orangegate's response to RTC's complaint was labeled a "Counterclaim." We agree, however, with other courts that § 1821(d)(13)(D) divests the district courts of jurisdiction over both claims and counterclaims against the RTC until the claimants have exhausted the administrative procedures created by FIRREA. *See, e.g., RTC v. Mustang Partners,* 946 F.2d 103, 106 (10th Cir.1991). Therefore, the fact that the pleading was labeled a counterclaim does not avoid the jurisdictional limitations imposed by FIRREA.

Although Orangegate's response is labeled as a "counterclaim," we conclude a better description of the reformation claim is "affirmative defense." Here, Orangegate is attempting to defend itself from personal liability on the note by asserting the defense of mutual mistake. Mutual mistake consistently has been recognized as an affirmative defense, *see Local Joint Exec. Bd. of Spokane v. Spokane Lodge No. 228,* 443 F.2d 403, 404 (9th Cir.1971), one which is waived if not included in a party's first response to an opponent's pleading. Fed.R.Civ.P. 8(c); *see Landmark Bank of St. Charles County v. Saettele,* 784 F.Supp. 1434, 1440 (E.D.Mo. 1992) (holding defendant waived his defense of mutual mistake by failing to raise that

affirmative defense in answer to complaint). We further note that Fed.R.Civ.P. 8(c) allows the court to treat the pleading as an affirmative defense rather than a counterclaim "if justice so desires." We conclude that in this case justice requires us to treat Orangegate's "Counterclaim" as an affirmative defense of mutual mistake.

In many courts, labelling Orangegate's claim for reformation as an affirmative defense rather than a counterclaim would not change the outcome. These courts have held § 1821(d)(13)(D) divests courts of jurisdiction over both counterclaims and affirmative defenses asserted in response to a complaint brought by RTC until the appropriate administrative remedies are exhausted. For example, in *RTC v. Youngblood*, 807 F.Supp. 765 (N.D.Ga.1992), the district court refused to exercise jurisdiction over the affirmative defenses of indemnification and set-off:

> [T]hese affirmative defenses are in reality claims against the assets of the failed financial institution and therefore come under the language of 12 U.S.C. § 1821(d)(13)(D), which removes such claims from the jurisdiction of the court until such time as the administrative claims process has been completed. As the administrative process has not been completed, the court lacks jurisdiction to hear these issues, regardless of whether they are couched in terms of counterclaim or affirmative defense.

*Youngblood*, 807 F.Supp. at 770. *See also RTC v. Scaletty*, 810 F.Supp. 1505 (D.Kan. 1992); *Talmo v. FDIC*, 782 F.Supp. 1538, 1542 (S.D.Fla.1991).

Other courts, however, have distinguished between counterclaims and affirmative defenses, and have exercised jurisdiction over affirmative defenses even though the proper administrative procedures had not yet been exhausted. *See RTC v. Conner*, 817 F.Supp. 98 (W.D.Okla.1993); *RTC v. Ryan*, 801 F.Supp. 1545, 1555–56 (S.D.Miss.1992); *FDIC v. Vernon Real Estate Invs., Ltd.*, 798 F.Supp. 1009, 1014 (S.D.N.Y.1992). The district court in *Conner* provides particularly persuasive reasoning behind its holding that § 1821(d)(13)(D) does not divest the district court of jurisdiction over affirmative defenses:

> This Court's review of the provisions in Section 1821(d) governing the administrative claims process and the apparent relationship between that procedure and the divestiture of jurisdiction in Section 1821(d)(13)(D) enriches and reinforces this Court's understanding of the terms "claim" and "action" as used in Section 1821(d)(13)(D). Although "claim" and "action" are not defined in Section 1812(d) or elsewhere in FIRREA, Section 1821(d) does make reference to *creditors* of the depository institution, claims by creditors and claims of security, preference or priority. *See* 12 U.S.C. 1821(d)(3)(B) & (C); 12 U.S.C. § 1821(d)(5)(D). Nowhere is the term "defense" or "potential defense" used. Indeed, the usage of the terms "claim" and "action" in other provisions of Section 1821(d) negates any inference that those terms as used therein include and encompass "defenses." The receiver is not required to publish or mail any notices for presentment of claims except to *creditors* of the depository institution. 12 U.S.C. § 1821(d)(3)(B) & (C).

> The interpretation of Section 1821(d)(13)(D) urged by the RTC and adopted by [other courts] would require parties such as Defendants who are not creditors of a failed depository institution and do not receive statutory notice of the requirement of and deadline for filing claims, who have no independent basis for bringing an action against the RTC and against whom the RTC has not brought suit, to present to the RTC as receiver any potential defenses that they might have to claims that the RTC as receiver or in its corporate capacity might one day assert against them, which are as yet unknown, and proof thereof. In summary, the rest of subsection d of Section 1821 gives the Court no reason to think that Section 1821(d)(13)(D) does not mean what it says. In fact, it so underscores what the Court finds is the plain meaning of § 1821(d)(13)(D) that if § 1821(d)(13)(D) were determined to be ambiguous, reference to the statute as a whole would nevertheless compel the conclusion that "claim"

and "action" as used therein do not encompass affirmative defenses. Finally, the Court's consideration of subsection d of Section 1821 in its entirety leads the Court to conclude that even if the plain language of § 1821(d)(13)(D) were read or understood to include affirmative defenses, an exception to the plain meaning rule of statutory construction would apply because such a literal application of the statute would produce a result demonstrably at odds with the intention of the drafters evidenced in the remainder of Section 1821(d), and would lead to the "patently absurd consequence" of requiring presentment and proof to the RTC of all potential affirmative defenses that might be asserted in response to unknown and unasserted claims or actions by the RTC.

*Conner,* 817 F.Supp. at 101–02 (footnote and citations omitted).

■ Having reviewed the reasoning behind the holdings on both side of the debate, we are persuaded that § 1821(d)(13)(D) does not divest a district court of jurisdiction over an affirmative defense such as mutual mistake. Therefore, we adopt the reasoning in *Conner,* and hold that a district court has subject matter jurisdiction over affirmative defenses raised by a defendant who, prior to being sued by the RTC, was not a creditor of the RTC and who had no independent basis for filing a claim against the RTC, even though the defendant had not exhausted the administrative procedures established by FIRREA.

Applying this rule to the instant case, we conclude Orangegate was not a creditor of MFS and had no independent basis for bringing an action against the RTC. Therefore, we hold the district court did have subject matter jurisdiction over Orangegate's affirmative defense of mutual mistake. By so holding, we avoid the "patently absurd consequence" of requiring Orangegate to file as administrative claims all potential affirmative defenses which might be asserted in response to unknown and unasserted claims by the RTC.

## IV

## REFORMATION

RTC argues the district court erred in reforming the loan documents to include a nonrecourse provision. Specifically, RTC contends reformation is precluded by the common-law *D'Oench* doctrine, 12 U.S.C. § 1823(e), and the federal holder in due course doctrine. Whether reformation is precluded by one of the three doctrines is a question of law we review de novo. *United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

### A. *The D'Oench Doctrine*

■ RTC argues it is protected against reformation by the common-law *D'Oench* doctrine established by the Supreme Court in 1942. *See D'Oench Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). In *D'Oench,* the Court "articulated a rule designed to implement a 'federal policy to protect [the FDIC] and the public funds which it administers against misrepresentations as to the securities or other assets in the portfolios of the banks which [the FDIC] insures or to which it makes loans.'" *FSLIC v. Gemini Management,* 921 F.2d 241, 244 (9th Cir.1990) (quoting *D'Oench,* 315 U.S. at 457, 62 S.Ct. at 679). Explained simply, "*D'Oench* precludes obligors from asserting side deals or secret agreements which may mislead bank examiners against the FDIC to diminish the value of written loan obligations." *FDIC v. Zook Bros. Constr. Co.,* 973 F.2d 1448, 1450 (9th Cir.1992).

The true test under *D'Oench* is whether "the [RTC] was put on notice of any agreement [that the loan was nonrecourse]." *Gemini Management,* 921 F.2d at 245 (quoting *FSLIC v. Two Rivers Associates,* 880 F.2d 1267, 1276 (11th Cir.1989)). "If ... the records of a bank evidence all the obligations of the bank, the regulating authority will not be deceived. Thus, *D'Oench, Duhme* does not bar the assertion of defenses based on a *bilateral obligation which appears in the bank's records.*" *Id.* (quoting *Two Rivers,* 880 F.2d at 1275 (emphasis added)).

The Ninth Circuit has applied *D'Oench* in a case similar to the instant case. In *Gemini Management*, the Federal Savings and Loan Insurance Company ("FSLIC") successfully invoked the *D'Oench* doctrine to bar a claim based on an alleged breach of an agreement to make a loan. *Id.* at 242. There, the court held "*D'Oench* and its progeny require a clear and explicit written obligation" of an agreement to make a loan. *Id.* at 245.

In *Gemini Management*, Gemini obtained a loan commitment letter supported by full loan documentation through negotiations with Centennial Savings and Loan Association. After the loan was made, Gemini defaulted. FSLIC, appointed receiver for Centennial, then sued to recover the borrowed funds. Gemini asserted as a defense and affirmative counterclaim that Centennial had breached an agreement to loan additional funds, which allegedly had been orally agreed to when the first loan was made. Gemini cited as evidence of the alleged agreement a previous loan commitment letter, which was not an enforceable instrument but provided some written confirmation that Centennial had, at least at one time, contemplated loaning Gemini the additional funds.

The court explained, however, that Centennial's " 'intent' to loan the additional [funds] falls short of establishing that Centennial was *obligated* to fund the entire project." *Id.* at 245. The court noted that an explicit written obligation to make the loan was required so that " 'federal and state bank examiners [may] rely on a bank's records in evaluating the worth of the bank's assets.' " *Id.* (quoting *Langley v. FDIC*, 484 U.S. 86, 91, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987)). The court also explained the first commitment letter was the only written record of the intent to loan additional funds and, because it was unsigned, not evidenced by a promissory note, and apparently had expired by its own terms by a certain date, was not enough to defeat *D'Oench*. *Id.*

Several factors in the instant case lead us to reach a conclusion in this case different from that reached in *Gemini*. First, the April 16 Commitment Letter is not the only evidence of the parties' intent to include a nonrecourse provision in the loan. Other

evidence includes both the minutes of the MFS Board meeting at which the loan, with a nonrecourse provision, was approved, and the Board submission form describing the loan to the Board members prior to approval. Moreover, the Commitment Letter was signed by both Orangegate and MFS prior to the Letter's date of expiration, and a commitment fee of $40,000 was paid and never refunded. Finally, although RTC suggests otherwise, the Commitment Letter was not superseded by another commitment letter as was the case in *Gemini*. In this case, "[i]t was [not] perfectly reasonable for the [RTC] to conclude that the terms of the [Commitment] Letter were superseded by the [subsequent Approval Letters] and [other] supporting documents." *Id.* at 245. In summary, the facts in this case and the facts in *Gemini* are manifestly different and compel different results.

We conclude, then, the common-law *D'Oench* doctrine, as interpreted by this court in *Gemini*, does not prevent the reformation of the Orangegate loan documents. The record demonstrates that the RTC was put on notice of the terms and conditions of the loan records of Midwest Bank's wholly owned subsidiary MFS which, by agreement, maintained possession of the records in question.

### B. *12 U.S.C. § 1823(e)*

■ RTC also contends the statutory *D'Oench* doctrine, 12 U.S.C. § 1823(e), prohibits the district court from reforming the loan documents to include a nonrecourse provision.

Section 1823(e) provides:

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 11 [12 U.S.C. § 1821], either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the

obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e). Congress extended the protections of § 1823(e) specifically to the RTC in 12 U.S.C. § 1441a(b)(4).

The Supreme Court has outlined the purposes of § 1823(e):

One purpose of § 1823(e) is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets.... Neither the FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions.

A second purpose of § 1823(e) is implicit in its requirement that the "agreement" not merely be on file in the bank's records at the time of an examination, but also have been executed and become a bank record "contemporaneously" with the making of the note and have been approved by officially recorded action of the bank's board or loan committee. These latter requirements ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure.

*Langley v. FDIC,* 484 U.S. 86, 91–92, 108 S.Ct. 396, 401 (1987); *see also Zook Bros. Constr. Co.,* 973 F.2d at 1451.

Although similar in purpose to the common-law doctrine, section 1823(e) "makes the common law principle both more encompassing and more precise." *FDIC v. O'Neil,* 809 F.2d 350, 353 (7th Cir.1987). As the Supreme Court explained, "The short of the matter is that Congress opted for the certainty of the requirements set forth in § 1823(e). An agreement that meets them prevails ...; and an agreement that does not meet them fails.... It would be rewriting the statute to hold otherwise." *Langley,* 484 U.S. at 95, 108 S.Ct. at 403.

Therefore, in order to reform the loan documents and insert a nonrecourse provision, a court must find the nonrecourse term found in the Commitment Letter satisfies the six distinct requirements of § 1823(e). Specifically, the "side agreement" must be (1) in writing; (2) executed by both Orangegate and the depository institution; (3) executed contemporaneously with the making of the promissory note; (4) approved by the board of the depository institution with (5) that approval reflected in the minutes of the board's activity; and (6) contained within the bank's records continuously since its execution.

The district court found that each of the requirements was satisfied:

12 U.S.C. § 1823(e) does not bar the reformation of this note, because (i) the nonrecourse character of the note is set forth in writing (the commitment letter); (ii) the commitment was executed by MFS; (iii) the nonrecourse character of the loan was approved by the Board of Directors of MFS; and (iv) the relevant documents have been in the files of MFS; alternatively, there is no evidence that defendants exercised any control over the maintenance of files at MFS. *See FDIC v. Meo,* 505 F.2d 790 (9th Cir.1974) (*D'Oench* is inapplicable to one wholly innocent of any wrongdoing or negligence).

A review of the record and the law leads us to agree with the district court that the statutory D'Oench doctrine does not prohibit reformation of the contract *in this case.*

### (1) Writing

Section 1823(e)(1) requires the agreement to be in writing. In the instant case, the Commitment Letter is in writing. Nevertheless, RTC argues there exists no written agreement to make the final loan nonrecourse. RTC points to *Torke v. FDIC,* 761 F.Supp. 754 (D.Colo.1991), to support its contention that nothing in the loan documents purports to include a nonrecourse provision.

In *Torke,* however, the borrower could produce no more than an inference of an alleged side agreement. *Torke,* 761 F.Supp. at 757. Based on those facts, the court in that case held correctly, "An inference of an alleged agreement does not meet the categorical requirements of § 1823(e)." *Id.*

*Torke* is inapposite in this instance. Here, Orangegate has produced a written agreement between the parties, the Commitment Letter, which contains a nonrecourse provision. We conclude the Commitment Letter satisfies the requirement of a writing.

### (2) *Executed by Both Parties*

Section 1823(e)(2) requires the writing be executed by both the obligor and the depository institution. "In the context of section 1823(e)(2), 'executed' [means] that the deposi-

---

5. RTC persistently refers to the Commitment Letter as "expired by its own terms." A careful examination of the record, however, demonstrates that this claim by the RTC is wholly without support. The district court's findings of fact on this issue, which appear to be thorough and correct, are as follows:

9. The Commitment Letter was fully executed by Ronald Barnes, President of MFS, and the Orangegate partners. The Commitment Letter required Orangegate to deposit $40,000 of the $160,000 anticipated loan fee at the time of accepting the commitment. The deposit would be refunded only if the loan was not approved. The terms of the Commitment Letter were duly and timely accepted by Orangegate.

10. On May 21, 1985, the Orangegate loan was presented to the Board of Directors of MFS. Exhibit "14", the Board Submission, bearing the seal of the secretary of MFS, William Gummeringer, is marked "Approved" and states as follows:

LOAN RECOMMENDED: ... A letter of credit for $250,000 is to be provided as interest reserve for the first year. This will be a non-recourse loan to the partnership, however as a separate document, John B. Joseph is to sign a $1,000,000.00 personal guarantee.

11. The Board of directors of MFS approved the Orangegate loan on the terms set forth on the Board Submission on May 21, 1985. The minutes of the Board of Directors were introduced into evidence as Exhibit "15". These minutes also provide:

Loan Recommended: ... A letter of credit for $250,000.00 is to be provided as interest reserve for the first year. This will be a non-recourse loan to the partnership, however, as a separate document John B. Joseph is to sign a $1,000,000.00 personal guarantee.

12. On June 20, 1985, the Board Submission was executed by Connie Kelly, Vice President of

---

tory institution has 'signed' the agreement. That a piece of paper merely recites obligations of more than one party is insufficient to prevent FSLIC's use of *D'Oench* and section 1823(e)." *Twin Constr., Inc. v. Boca Raton, Inc.,* 925 F.2d 378, 384 (11th Cir. 1991).

Here, we hold the Commitment Letter satisfies the execution requirement. Both the partners of Orangegate and MFS signed the Commitment Letter prior to its expiration date.[5] Moreover, both parties were required to perform certain obligations under the Letter's terms.

### (3) *Executed Contemporaneously with Loan*

■ Section 1823(e)(2) also requires the "side agreement" be executed "contempora-

---

MFS, indicating final MFS approval of the loan as submitted and recommended.

13. On June 27, 1985, MFS sent a letter (the "Approval Letter") to Orangegate notifying them that the loan had been approved, and generally setting forth the terms of the loan. (Trial Exhibit 19.)

. . . . .

Based on these conclusions of fact, the district court registered these conclusions of law, all of which in our judgment are supported by the facts and are correct:

2. The Commitment Letter of April 16, 1985 was a commitment by MFS to provide a non-recourse loan to Orangegate Investors.

3. The terms of the commitment Letter were accepted by all parties in writing.

4. The Board of Directors of MFS approved the Orangegate loan as a non-recourse loan, subject to the other terms and conditions of the Commitment Letter, including John Joseph's personal guaranty of $1 million, and the posting of a $250,000 letter of credit. This approval of the non-recourse term of the loan is reflected in the minutes of the Board of Directors of MFS.

5. The Approval Letter of June 27, 1985 was notification by MFS that the terms of the loan committed to on April 16, 1985 had been approved by MFS, including the non-recourse term of the loan.

Moreover, when the partnership accepted the terms of the Commitment Letter it sent a $40,000 check to MFS as the commitment fee. This fee was never refunded. We also agree with the district court's conclusion as to the letters of July 2, 1985 and July 8, 1985: they "do not constitute new commitment letters and do not in anyway alter the terms of the prior loan approval.

Thus, we respectfully reject the RTC's claim to the contrary.

neously with the acquisition of the asset by the depository institution." We agree with other courts that "contemporaneously" should be strictly interpreted. Such an interpretation, however, must be informed by the realities of the transaction. In *FDIC v. Virginia Crossings Partnership*, 909 F.2d 306 (8th Cir.1990), for example, the Eighth Circuit rejected the argument that memoranda executed five months prior to the making of loans was contemporaneous:

> The plain language of § 1823(e) requires that an agreement, to be effective against the FDIC, must be executed by the bank and the obligor contemporaneously with the making of the note.... These documents [alleging a side agreement] were dated well in advance of the making of the notes on December 30, 1983....

> Appellants urge us to overlook [this] obvious infirmit[y], contending that each memoranda "complies with the purpose of the requirement." ... In view of the "categorical" requirements of § 1823(e), we are constrained to reject this assertion.

*Virginia Crossings,* 909 F.2d at 309.

This strict interpretation of "contemporaneously" was explained by another court in rejecting alleged side agreements executed as little as *three months* prior to the execution of the first of two notes involved:

> The defendants contend that the interest rate was to be variable in accordance with a "commitment letter" dated July 14, 1984, and signed by the defendants and an officer of the bank. Under the variable terms of the commitment letter, the interest due on the notes would be less than the interest calculated by the terms set forth on Notes 1 and 2 [executed October 15, 1984, and March 5, 1985]. The Court finds that this defense is not available under the facts of this case.

> Under the *D'Oench, Duhme* Doctrine, codified at 12 U.S.C. § 1823(e), an agreement which varies the terms of the promissory note is not valid and effective against the RTC unless it satisfies all four requirements of the statute.... Although the commitment letter in this case does provide for a variable interest rate, adjusted quarterly, it was executed *before,* and *not*

*contemporaneously,* with Note 1 or Note 2. The Court finds that the "commitment letter" fails to meet the requirements of § 1823(e) and the intent of the parties is irrelevant. Therefore, the commitment letter is not valid or binding against the RTC.

*RTC v. Dubois,* 771 F.Supp. 154, 156 (M.D.La.1991) (footnotes omitted).

In the instant case, the Commitment Letter was executed more than two months prior to the final loan documents. RTC contends the two month gap between the signings of the Commitment Letter and the final loan documents requires us to conclude the contemporaneous element is not met in this case. Orangegate, on the other hand, contends such a strict interpretation of "contemporaneously" should not be adopted. As support, Orangegate cites *FDIC v. Manatt*, 922 F.2d 486 (8th Cir.), *cert. denied*, 501 U.S. 1250, 111 S.Ct. 2889, 115 L.Ed.2d 1054 (1991), a case it claims rejects an interpretation of the statute which ignores "commercial reality."

The court in *Manatt* expressed some doubt as to the application of a strict interpretation of "contemporaneously":

> We doubt that Congress intended that section 1823(e)(2)'s contemporaneousness requirement would defeat a valid accord and satisfaction entered into by a bank. Valid accord and satisfaction agreements are never contemporaneously executed with the initial documents incurring the debt— the idea that they would be so executed is simply contrary to general business practice and to common sense. Surely Congress did not mean to preclude banks from getting something of value by an accord and satisfaction rather than nothing at all.

*Manatt,* 922 F.2d at 489 n. 4. In *Manatt,* however, the court did not have the opportunity to apply its interpretation to the particular facts of the case. *Id.* ("In any event, we leave the reach and scope of section 1823(e)(2) to another day, as an interpretation of that clause is not necessary to a decision in this case.").

We find *Manatt* persuasive and agree that satisfaction of the contemporaneousness re-

quirement should be considered in light of commercial reality. General business practice requires more leniency than a few days when dealing with loans of this magnitude. Moreover, a commitment letter is part and parcel of this type of loan agreement. Therefore, we cannot say as a matter of law that a period of between two and three months under these circumstances rendered the Commitment Letter not contemporaneous. On the facts of the instant case, we conclude the Commitment Letter was contemporaneous with the preparation of the final loan documents in the sense that it takes several months to put together loans of this nature.

#### (4) *Approved by Board of Directors*

Section 1823(e)(3) requires the agreement be approved by the board of directors of the depository institution. Here, the Board of MFS approved the loan including the nonrecourse provision on May 21, 1985.

#### (5) *Approval Reflected in Minutes of Board*

Section 1823(e)(3) also requires the Board's approval be noted in the minutes of the Board. The minutes of the MFS board meeting on May 21, 1985, plainly note the Board's approval of the Orangegate loan complete with nonrecourse provision.

#### (6) *Records Kept Continuously in Depository Institution*

Finally, and very importantly, § 1823(e)(4) requires that the agreement "has been continuously, from the time of its execution, an official record of the depository institution." This subsection

> does not require that such agreements be confined to the face of any one particular lending/borrowing document.... The fact that an agreement between the failed lender and the borrower is manifested in more than one document does not automatically imply a deceptive secret agreement.

*RTC v. Oak Apts. Joint Venture,* 966 F.2d 995, 999 (5th Cir.1992). However, "[s]cattered evidence in corporate records from which one could infer the existence of an agreement does not meet the requirements of the statute." *Castleglen, Inc. v. RTC,* 984 F.2d 1571, 1579 (10th Cir.1993). Moreover, "the 'draft documents' file of the bank's outside attorney does not constitute 'an official record of the depository institution.'" *RTC v. McCrory,* 951 F.2d 68, 72 (5th Cir.) (quotations omitted), *cert. denied,* —— U.S. ——, 113 S.Ct. 459, 121 L.Ed.2d 368 (1992).

Here, RTC argues no records of the alleged "side agreement" continuously were included in the official records of Midwest Bank. RTC concedes, however, that the Commitment Letter was found in the records of both the loan servicer, Windtree, and Orangegate; the MFS Board's loan submission form was found in the records of both Windtree and MFS; and the minutes from MFS Board meeting at which the loan was approved were found in the files of both Windtree and MFS. RTC emphasizes that the Commitment Letter was not found in MFS's records.

The district court found "the relevant documents have been in the files of MFS." A district court's findings of fact are reviewed under the clearly erroneous standard. Fed. R.Civ.P. 52(a). The district court's finding apparently is based upon RTC's production of the Commitment Letter in response to Orangegate's discovery request for bank records. Whatever the basis of the finding, in the light of Trial Exhibit # 39 we do not find it to be clearly erroneous.

In its brief, Orangegate centers its arguments on the mutual mistake of the parties that led to the failure of the final loan documents to contain a nonrecourse provision. Whether a mutual mistake occurred does not in and of itself resolve this case. In order to have the opportunity to show mutual mistake, and then reform the loan documents, Orangegate *first* must satisfy the *D'Oench* doctrine as codified in 12 U.S.C. § 1823(e). To do so, Orangegate must show the agreement containing the nonrecourse provision satisfied the six requirements found in § 1823(e)(1)–(4). In this case, the Commitment Letter satisfies all six requirements. Therefore, we hold the district court correctly concluded Orangegate satisfied the categorical requirements of § 1823(e) and was

entitled to reform the loan documents to include the nonrecourse provision found in the Commitment Letter.[6]

Finally, the RTC argues the district court erred in holding that Orangegate met its burden to produce clear and convincing evidence of a mutual mistake as to the recourse nature of the loan. The district court's finding that a mutual mistake occurred is a finding of fact reviewed under the clearly erroneous standard. Fed.R.Civ.P. 52(a). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Service Employees Int'l Union v. Fair Political Practices*, 955 F.2d 1312, 1317 n. 7 (9th Cir.) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)), *cert. denied,* — U.S. ——, 112 S.Ct. 3056, 120 L.Ed.2d 922 (1992).

In this case, the record amply supports the district court's finding that "the Orangegate loan documents were drafted and executed in error, by mutual mistake of the parties, and that Orangegate Investors is entitled to reformation of the loan documents." The evidence supports the conclusion that the omission of the nonrecourse provision was the result of the parties' oversight, and not a renegotiation of the terms of the loan. We affirm the district court's finding of mutual mistake on the record presented.

## V

## ATTORNEYS' FEES

In No. 92–55350, the defendants appeal the district court's order entered February 19, 1992, denying their motion for attorneys' fees. The defendants argue the district court erred in concluding they were not the "prevailing party" in the case.[7]

A district court's failure to award attorneys' fees is generally reviewed for abuse of discretion. *FDIC v. Lugli,* 813 F.2d 1030, 1034 (9th Cir.1987). However, whether the district court's denial of Orangegate's application for attorneys' fees was proper under state law and the contractual provisions of the Orangegate promissory note is reviewed de novo. *Id.*

■ The district court failed to decide whether California or federal common law applied to interpret the attorneys' fees provision found in the loan document. Here,

---

6. RTC also contends "[r]eformation of a promissory note cannot be had against a holder in due course based upon mutual mistake." Orangegate points out, however, that this issue is raised for the first time on appeal.

Here, we need not reach the decision whether to address this issue for the first time on appeal. In *Newton v. Uniwest Financial Corp.*, 967 F.2d 340 (9th Cir.1992), the Ninth Circuit noted that the *D'Oench* doctrine is coextensive with any defense provided to the RTC under the federal holder in due course doctrine:

> Newton also refers to the holder in due course doctrine as a possible bar to his tying claim. For purposes of this appeal, it is not necessary to distinguish between this doctrine and the doctrine enunciated in *D'Oench. See FDIC v. Bank of San Francisco*, 817 F.2d 1395, 1398 (9th Cir.1987) (*"D'Oench* itself treated the FDIC as a holder in due course.")....

*Newton,* 967 F.2d at 343 n. 3.

Therefore, because the *D'Oench* doctrine does not bar Orangegate from reforming the loan documents, we hold the RTC is entitled to no further protection under the federal holder in due course doctrine.

7. In a separate brief, defendants La Plata Investors, Nolan, Beck, Wilson, Main Street Investors,

Breazeale, Tice and Gardner argue they are "prevailing parties" because not only did they prevail in the case below, but also they were no longer partners in Orangegate when RTC sued to recover on the loan. The district court held merely that under California law there could be only one prevailing party on a contract. In this case, the district court held that defendants, as a whole, were not the prevailing party in the action.

We agree that the "departing partners" are not a prevailing party in this case. The RTC succeeded in foreclosing on the loan and recovering the property. On the other hand, depending on the value of that property, the defendants may not have saved themselves any money by reforming the loan from recourse to nonrecourse. Moreover, these "departing" partners acted together with the other defendants, including Joseph, *throughout this action,* a fact which supports the district court refusal to separate the defendants when considering the attorneys' fees issue. Therefore, the departing partners are not entitled to attorneys' fees for any stage in this action.

Orangegate's motion for attorneys' fees is based on that provision:

> If the Note holder incurs legal fees or costs in referring this Note to any attorney for collection or seeking legal advice following a default, or if any other judicial or non-judicial action is instituted, or an attorney is employed to reclaim, sequester, protect, preserve, or enforce the Note holder's rights herein, or in the deed of trust or in any other agreement securing payment of this Note, including but not limited to proceedings under the federal bankruptcy law or eminent domain, the Borrower agrees to pay reasonable attorneys fees and costs including reasonable attorneys fees and costs upon appeal.

The note expressly provides that California law shall be used to interpret the terms of the loan agreement.

Generally, courts adjudicating cases in which the RTC is a party apply federal law. Here, however, the district court should have applied California law in interpreting the attorneys' fees provision in the contract. *Hellon & Associates, Inc. v. Phoenix Resort Corp.*, 958 F.2d 295, 300 (9th Cir.1992); *see also Fobian v. Western Farm Credit Bank (In re Fobian)*, 951 F.2d 1149, 1153 (9th Cir.1991) ("Where a contract ... provides for an award of attorneys' fees, a creditor may be entitled to such fees in bankruptcy proceedings. Such an award is governed by state law."), *cert. denied,* —— U.S. ——, 112 S.Ct. 3031, 120 L.Ed.2d 902 (1992); *United States ex rel. Reed v. Callahan*, 884 F.2d 1180, 1185 (9th Cir.1989) ("Like a court sitting in diversity, we use the law of the forum state to construe the agreement.") (Miller Act case), *cert. denied,* 493 U.S. 1094, 110 S.Ct. 1167, 107 L.Ed.2d 1069 (1990). The court must apply state law in this situation unless (1) the claim for fees arose under some federal statute, *United States ex rel. Leno v. Summit Constr. Co.*, 892 F.2d 788, 791 (9th Cir.1989); or (2) "the litigated issues involve not basic contractual enforcement question, but issues peculiar to [federal law]," *In re Fobian*, 951 F.2d at 1153. Neither situation exists in this case. Therefore, whether Orangegate is entitled to an award of attorneys' fees under the provision in the loan agreement is a question of California law.

Orangegate contends it is entitled to attorneys' fees under Cal.Civ.Code § 1717:

> (a) In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs.
>
> . . . .
>
> (b)(1) The court, upon notice and motion by a party, shall determine who is the party prevailing on the contract for purposes of this section, whether or not the suit proceeds to final judgment. Except as provided in paragraph (2), *the party prevailing on the contract shall be the party who recovered a greater relief in the action on the contract.* The court may also determine that there is no party prevailing on the contract for purposes of this section.

Cal.Civ.Code § 1717 (West 1993) (emphasis supplied).

Under this statute, the district court concluded that the RTC "recovered a greater relief in the action on the contract." We agree. By succeeding on its counterclaim, Orangegate merely reduced its potential liability on the note from $8 to $9 million to $5 to $6 million. The RTC's recovery of over $5 million made it the "prevailing party" under Cal.Civ.Code § 1717(b)(1).

■ Orangegate disputes this approach, and cites *National Computer Rental Ltd. v. Bergen Brunswig Corp.*, 59 Cal.App.3d 58, 63, 130 Cal.Rptr. 360 (1976), to support its argument that the party who prevails on the issues actually litigated is the prevailing party for purposes of awarding attorneys' fees. We note that *National Computer Rental* was decided twelve years prior to the addition of the "greater relief" language in § 1717(b)(1). The inclusion of this language calls into serious question the precedential value of *National Computer Rental* and other cases cit-

ed as support by Orangegate. Under the specific language now applicable, RTC must be considered the "prevailing party" because it recovered a greater amount than Orangegate in the complete action on the contract. We affirm the district court's denial of Orangegate's motion for attorneys' fees.[8]

## VI

## CONCLUSION

We affirm the district court's exercise of subject matter jurisdiction over Orangegate's affirmative defense of mutual mistake. We also affirm the district court's holding that reformation of the loan documents was not prohibited by the common-law *D'Oench* doctrine, 12 U.S.C. § 1823(e), or the federal holder in due course doctrine. Finally, we affirm the district court's ruling that none of the borrowers were entitled to attorneys' fees.

AFFIRMED.

---

8. The RTC makes a motion to this court to dismiss Orangegate's appeal or, in the alternative, strike an assertion in Orangegate's brief. RTC contends the entire appeal should be dismissed because Orangegate, in its reply brief, asserts that two defendants, West Coast Realty, a junior lienholder closed out by the foreclosure, and Joseph, the personal guarantor, "do not assert a right to collect attorneys' fees." In response, Orangegate says note 3 is "a statement of intention, not of fact." Because we affirm the district court's denial of attorneys' fees, we deny RTC's motion.